*Decision will be entered under Rule 50.*

WALTER H. POTTER AND GLADYS L. ERICKSON (FORMERLY GLADYS L. POTTER), PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT
WALTER H. POTTER AND MARY D. POTTER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 81795, 86259. Filed May 13, 1965.

*J. Everett Blum*, for the petitioners.
*Robert L. Gnaizda*, for the respondent.

TRAIN, *Judge:* In these consolidated proceedings, respondent determined deficiencies in income tax of $328,563.55 in docket No. 81795 for 1955 and of $22,668.56 and $28,307.22 in docket No. 86259 for 1956 and 1957, respectively. These deficiencies arise mainly from respondent's inclusion in petitioners' 1955 and 1956 taxable income of the outstanding balance of certain first trust deed notes which petitioners received in years prior to 1955, and in 1955 and 1956, but excluded by them from the computation of taxable income for such

years.[1] The parties have stipulated that for the taxable year 1957 an overassessment in favor of the petitioners may occur. The amount of overassessment, if any, will be determined under Rule 50 of this Court.

As respects 1955, petitioners maintain that respondent's adjustment constituted a change in petitioners' method of accounting and that to the extent the deficiency is attributable to amounts still due on notes received prior to January 1, 1954, it is barred by the provisions of section 481(a)(2) of the Internal Revenue Code of 1954.[2]

By amended answer filed in docket No. 81795, respondent admitted error in the inclusion of certain items[3] in petitioners' 1955 taxable income and determined that certain dispositions of trust deed notes between petitioners, incident to a division of community property,[4] were taxable dispositions of installment obligations.[5] The adjusted deficiency for 1955 set forth in the amended answer is $260,860.07.[6]

The parties have agreed that 83 percent of the face value of all first trust deed notes represented the fair market value of those notes and should have been included in income in the years the notes were received. Thus, the final issue for decision is whether the 17-percent discount income received by petitioners is taxable as payments on the first trust deed notes are received, or only after the receipt of the 83-percent capital.

Several other issues have been settled by stipulation of the parties, conceded, or abandoned. Consequently, decisions will be entered under Rule 50.

### FINDINGS OF FACT

Most of the facts have been stipulated and the stipulations of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioners Walter H. Potter (hereinafter referred to as petitioner) and Gladys L. Erickson (formerly Gladys L. Potter and hereinafter referred to as Gladys) were husband and wife during the year 1955 and filed their joint income tax return for the calendar year ended

---

[1] In these years, petitioners received a number of first trust deed notes, deducted the total face value of an arbitrary number of such notes from gross receipts each year and, designating these latter notes as deferred contracts, reported in income each year the total amount of payments received on them in that year.

[2] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

[3] Respondent admitted that the inclusion in petitioners' 1955 taxable income of $147,109.09 allocable to pre-1954 first trust deed notes, and $35,685.73 allocable to 1954 first trust deed notes, was erroneous and reduced petitioners' taxable income by $182,794.82.

[4] On Dec. 1, 1955, petitioners divided their community property pursuant to a property settlement included in a decree of divorce dated Apr. 16, 1956.

[5] Pursuant to this determination, respondent increased petitioners' 1955 taxable income by $108,027.32.

[6] This adjusted deficiency was further adjusted by stipulation of the parties in docket No. 86259 as set forth in our Findings of Fact.

December 31, 1955, with the district director of internal revenue at Los Angeles, Calif. Petitioner and Mary D. Potter were husband and wife during the years 1956 and 1957 and filed their joint income tax returns for those years with the district director of internal revenue at Los Angeles, Calif. The returns for the years in question were prepared essentially on the cash receipts and disbursements basis. The profit-and-loss schedules (Schedule C) for those years were prepared on a basis similar to a completed-contract basis. However, in the profit-and-loss schedule certain first trust deed notes received in 1955 and 1956 were included in gross receipts in the years received and then deducted therefrom so that they were not included in the computation of taxable income for those years.

Petitioner was in the business of building and selling houses in 1955, 1956, and 1957 and for many years prior thereto. His usual method of selling houses was to receive a small cash payment plus a note, secured by a deed of trust on the individual house sold, to cover the balance of the sale price. Generally, the costs of construction of the houses so built were financed by borrowing from financial institutions and giving to the institutions notes secured by first deeds of trust. In these instances petitioner received second deeds of trust. Occasionally, petitioner used his own capital to finance the cost of construction of the houses he built and received notes secured by first deeds of trust.

The first trust deed notes received by petitioner were payable monthly for periods of as long as 18 years. The parties have stipulated that all first trust deed notes received by petitioner in 1955, 1956, and 1957 had a fair market value of 83 percent of face value. The parties have also stipulated that the second trust deed notes had "a fair market value on the date received by petitioner of zero—that is, they had no fair market value." The face value of first trust deed notes received by petitioner in 1955 and 1956 was $219,950.04 and $186,861.57, respectively. All of these first trust deeds and first trust deed notes were identical in all relevant respects.

All of the first trust deed notes received by petitioner in 1955 and 1956 were included in gross receipts at face value. However, approximately 42 percent ($93,000) of the face value of the 1955 notes and 15 percent ($28,408) of the face value of the 1956 notes were then deducted by petitioner from gross receipts. All costs incurred in completing the houses for which notes secured by first trust deeds were received in 1955 and 1956 were deducted in the year the deeds and notes were received (including the costs allocable to the first trust deed notes not included by petitioner in his computation of taxable income).

In examining and auditing petitioner's 1955 income tax return, respondent required, and petitioner agreed, that all first trust deed

notes received by petitioner in 1955 and subsequent years should have been included in the computation of taxable income at their fair market value of 83 percent of face value.

Petitioner's manner of treatment, for income tax purposes, of the first trust deed notes he received was initiated in approximately 1947. The principal from the notes which was deducted from gross income on petitioner's returns when the notes were received, was included in the computation of taxable income on petitioner's returns for the years in which payments on the notes were received. Principal from first trust deed notes received before 1954 and not included in income before 1954 was in the amount of $188,081.31 as of January 1, 1955. The parties have stipulated that, if it is determined that respondent changed petitioner's method of accounting, this amount will never be included in petitioner's taxable income because of the provisions of section 481.

The sum of $11,662.02, representing return of principal received in 1956 on pre-1954 first trust deed notes, was included in taxable income in 1956. The parties have stipulated that, if it is determined in docket No. 81795 that respondent changed petitioner's method of accounting, this amount should be excluded from income in 1956. The sum of $9,852.38 was received in 1956 from second trust deed notes taken in prior years; the parties have stipulated that this sum should be included in 1956 income. The sum of $13,093.70 was received in 1957 from second trust deed notes taken in prior years; the parties have stipulated that this sum should be included in 1957 income. (These two sums were reported in income by the petitioners. However, respondent's amended answer excluded one-half of each of these sums from 1956 and 1957 income. Based upon the stipulation of facts filed in docket No. 81795, the parties have agreed that the amended answer is superseded and these sums are to be fully included in 1956 and 1957 income.)

In 1956 and 1957 petitioner collected principal in the amounts of $925.41 and $966.57, respectively, from first trust deed notes received prior to 1954. The parties have stipulated that, if it is determined in docket No. 81795 that respondent changed petitioner's method of accounting, none of these amounts are ever to be included in income. The parties also have stipulated that, if it is determined that respondent did not change petitioner's method of accounting, the entire amounts will be included in income in 1956 and 1957 except that, if it is determined in docket No. 81795 that the first trust deed notes disposed of in 1955 between petitioner and Gladys were installment obligations, only one-half of these amounts will be included in income.

On December 1, 1955, petitioner and Gladys divided their community property. This division occurred as a result of a property settlement included in a decree of divorce dated April 16, 1956. The

division of community property included a disposition by Gladys of first trust deed notes in the face amount of $20,118.41 to petitioner and a disposition by petitioner of first trust deed notes in the face amount of $141,643.37 to Gladys. Being community property, petitioner and Gladys each had a one-half interest in all the notes. The fair market value of these notes at the time of their disposition was 83 percent of their face amount. Gladys also disposed of second trust deed notes in the face amount of $54,292.84.[7] The fair market value of these notes at the time of their disposition was "zero."

The first trust deed notes disposed of between Gladys and petitioner were acquired over a number of years. The face amount of these notes as of December 1, 1955, represented the amounts remaining due on notes which had never been included in income. At the time these notes were originally received they had a fair market value but they were erroneously not included in income. Instead, the entire principal amount of these notes was included in income as the amounts were received. Petitioner contends these notes were reported as deferred contracts not on the installment method. Respondent contends these notes constituted installment obligations within the meaning of section 453. The parties have stipulated that, if these notes constituted installment obligations for purposes of section 453, then 83 percent of the face value of the first trust deed notes disposed of between Gladys and petitioner is taxable and the disposition of the second trust deed notes is not taxable.

The parties have stipulated that petitioner's experience with first trust deed notes in 1955 and 1956, as well as with those received in the years 1947 through 1954, has been as follows:

(1) From 1947 through 1956, petitioner received at least 50 first trust deed notes.

(2) No foreclosures have occurred with respect to any of these first trust deed notes.

(3) On occasion, first trust deed notes, although not seasoned, have been valued and accepted at face amount by independent parties.

(4) The prevailing marketplace rate of interest on first trust deed notes similar to those received in 1955 and 1956 was at least 6 percent. The rate of interest on the first trust deed notes received in 1955 and 1956 was 5 percent.

(5) The value of the property which secured the first trust deed notes received in 1955 and 1956, at the time these notes were received, was in excess of the face amount of these notes. The value of the property securing these notes had always been in excess of the unpaid balances on these notes. As the unpaid balances decreased, the value of the property in relation to the unpaid balances has increased.

---

[7] The record is not clear as to whether this disposition was made to petitioner or to third parties.

OPINION

## Issue 1

Petitioner maintains that respondent's determination that the fair market value of all first trust deed notes should have been included in the computation of taxable income for the year in which they were received constituted a change in petitioner's method of accounting under section 446.[3]

Petitioner first contends that his original manner of reporting the receipts from first trust deed notes, i.e., including all such notes in gross receipts and then deducting the face amount of an arbitrary number of them which were termed "deferred contracts," was a method of accounting under section 1.446-1(a)(1), Income Tax Regs. He contends that the method of reporting receipts from the notes required by respondent, and agreed to by petitioner, was a method of accounting under section 1.446-1(a)(1), Income Tax Regs., different than petitioner's original method. Petitioner then cites sections 1.446-1(e)(2) (i) and (ii) and 1.481-1(a)(11), Income Tax Regs., for the proposition that the change initiated and required by respondent was a change in petitioner's method of accounting because it required a change in the treatment of a material item. Finally, petitioner contends that although each individual note may be a subitem of the overall item of first trust deed notes, the subitems themselves are material items within the meaning of sections 1.446-1(a)(1) and 1.446-1(e)(2) (i) and (ii), Income Tax Regs.

Respondent contends that petitioner was not required to change his treatment of a material item but merely to correct an inconsistency in such treatment. Respondent contends petitioner was treating identical notes differently by reporting some at face value and some at "zero" value and that respondent simply was requiring identical treatment for all of these identical notes. Finally, respondent contends that nothing in reported case law or legislative history justifies petitioner's contention that a correction of the treatment of some

---

[3] SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.

(a) GENERAL RULE.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

(b) EXCEPTIONS.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.

(c) PERMISSIBLE METHODS.—Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting—

(1) the cash receipts and disbursements method;

(2) an accrual method;

(3) any other method permitted by this chapter; or

(4) any combination of the foregoing methods permitted under regulations prescribed by the Secretary or his delegate.

identical subitems of one material item results in a change of accounting method.

Petitioner cites numerous cases for the proposition that a change in the treatment of a material item results in a change of accounting method. He asserts that a number of them stand for the proposition that a change in the treatment of a subitem of a material item constitutes a change in the treatment of a material item. Respondent contends none of the cited cases support petitioner because they all involve the treatment of an entire item while the instant case involves the inconsistent treatment of identical subitems of an entire item.[9]

We have carefully examined all of the cited cases but, in holding for the respondent on this issue, we find it unnecessary to consider what constitutes a material item. Petitioner's practices fail the much more basic tests of consistency, regularity, and proper reflection of income.

In promulgating section 446 of the Revenue Act of 1954 (H.R. 8300, 83d Cong., 2d Sess. (1954)), Congress saw fit to expand substantially the ambit of what constitutes a method of accounting for purposes of the Internal Revenue Code.

Present law provides that the net income of a taxpayer shall be computed in accordance with the method of accounting regularly employed by the taxpayer, if such method clearly reflects the income, and the regulations state that approved standard methods of accounting will ordinarily be regarded as clearly reflecting taxable income. Nevertheless, as a result of court decisions and rulings, there have developed many divergencies between the computation of income for tax purposes and income for business purposes as computed under generally accepted accounting principles. The areas of difference are confined almost entirely to questions of when certain types of revenue and expenses should be taken into account in arriving at net income.

The changes embodied in the House bill and in your committee's bill are designed to bring the income-tax provisions of the law into harmony with generally accepted accounting principles, and to assure that all items of income and deductions are to be taken into account once, but only once in the computation of taxable income. [S. Rept. No. 1622, 83d Cong., 2d Sess., p. 62 (1954).]

\* \* \* \* \* \* \*

In subsection (c) the permissible methods of accounting subject to the provisions of subsections (a) and (b) are enumerated. All methods of accounting recognized under existing law are continued. *In addition one or more hybrid methods may be authorized in the regulations issued under paragraph (4).* One such method, in the case of a small retail store, will be an accrual of items affecting gross income such as purchases, sales of goods, accounts payable, and accounts receivable. In such a case items of deduction such as rent, interest,

---

[9] Respondent admits that what is meant by a change in treatment of a material item is not completely defined by the examples in sec. 1.446–1(e),(2)(ii), Income Tax Regs. While not endeavoring to set forth precisely what constitutes a material item, respondent seems to maintain that a material item cannot be a single item out of a group of identical items but must be the entire group; that all identical items must be aggregated. Respondent does not allude to the problem of what would happen when an item is one of a kind. See *Graff Chevrolet Co.* v. *Campbell*, 343 F. 2d 568 (C.A. 5, 1965), affirming an unreported case (N.D. Tex. 1963, 12 A.F.T.R. 2d 5907, 63–2 U.S.T.C. par. 9789).

clerks' salaries, insurance and similar items may be accounted for on a cash basis. Any such hybrid method is, of course, subject to the requirements of subsection (b) that there be a clear reflection of income under the method. [Emphasis supplied. S. Rept. No. 1622, 83d Cong., 2d Sess., p. 300 (1954).]

Hybrid methods of accounting were not permissible under the 1939 Code or prior revenue laws. See *United States* v. *Anderson*, 269 U.S. 422 (1926), and numerous subsequent cases which have required a taxpayer who reported income on an accrual basis to deduct from gross income all liabilities which accrued in the same taxable year. Also see *Mass. Mutual Life Ins. Co.* v. *United States*, 288 U.S. 269 (1933), where the Supreme Court said at pages 273–274:

The regulations of the Treasury under all the Revenue Acts since 1916 have required taxpayers to report on the cash or accrual basis, depending on which method was pursued in their accounting. Since the adoption of the Revenue Act of 1921 the requirement has been statutory. It is settled beyond cavil that taxpayers other than insurance companies may not accrue receipts and treat expenditures on a cash basis, or vice versa. Nor may they accrue a portion of income and deal with the remainder on a cash basis, nor take deductions partly on one and partly on the other basis.

This concept was also very succinctly expressed in *Hygienic Products Co.* v. *Commissioner*, 111 F. 2d 330 (C.A. 6, 1940), affirming 37 B.T.A. 202 (1938), where the Court of Appeals said at page 331:

Petitioner characterizes its system of accounting as "hybrid." No such system, however, is recognized by the Act; unless the system conforms to the one method, it does not reflect income in accordance with the Act, and the Commissioner is empowered to make such corrections as are necessary to make the return accurately reflect income. * * *

Congress effected its intent as expressed in S. Rept. No. 1622, *supra*, by enacting section 446(c) which reads, in part, as follows:

SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.

(c) PERMISSIBLE METHODS.—Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting—

(1) the cash receipts and disbursements method;

(2) an accrual method;

(3) any other method permitted by this chapter; or

(4) any combination of the foregoing methods permitted under regulations prescribed by the Secretary or his delegate.

The Commissioner implemented section 446(c)(4) in his regulations which read, in part, as follows:

Sec. 1.446–1 General rule for methods of accounting.

(c) *Permissible methods*—(1) *In general.* Subject to the provisions of paragraphs (a) and (b) of this section, a taxpayer may compute his taxable income under any of the following methods of accounting:

\*       \*       \*       \*       \*       \*       \*

(iv) *Combinations of the foregoing methods.* (a) In accordance with the following rules, any combination of the foregoing methods of accounting will be

permitted in connection with a trade or business if such combination clearly reflects income and is consistently used. Where a combination of methods of accounting includes any special methods, such as those referred to in subdivision (iii) of this subparagraph, the taxpayer must comply with the requirements relating to such special methods. A taxpayer using an accrual method of accounting with respect to purchases and sales may use the cash method in computing all other items of income and expense. However, a taxpayer who uses the cash method of accounting in computing gross income from his trade or business shall use the cash method in computing expenses of such trade or business. Similarly, a taxpayer who uses an accrual method of accounting in computing business expenses shall use an accrual method in computing items affecting gross income from his trade or business.

(b) A taxpayer using one method of accounting in computing items of income and deductions of his trade or business may compute other items of income and deductions not connected with his trade or business under a different method of accounting.

The Commissioner's regulations under section 446 are replete with expressions of the requirement that methods of accounting be regular, consistent, and clearly reflect income.[10]

Petitioner has stipulated that his failure to include the fair market value of all first trust deed notes in the computation of taxable income

---

[10] Sec. 1.446–1 General rule for methods of accounting.

(a) *General rule.* (1) Section 446(a) provides that taxable income shall be computed under the method of accounting on the basis of which a taxpayer *regularly* computes his income in keeping his books. * * * Except for deviations permitted or required by such special accounting treatment, taxable income shall be computed under the method of accounting on the basis of which the taxpayer *regularly* computes his income in keeping his books. * * *

(2) * * * However, no method of accounting is acceptable unless, in the opinion of the Commissioner, it *clearly reflects income.* A method of accounting which reflects the *consistent* application of generally accepted accounting principles in a particular trade or business in accordance with accepted conditions or practices in that trade or business will ordinarily be regarded as *clearly reflecting income,* provided all items of gross income and expense are treated *consistently* from year to year.

* * * * * * *

(b) *Exceptions.* (1) If the taxpayer does not regularly employ a method of accounting which clearly *reflects his income,* the computation of taxable income shall be made in a manner which, in the opinion of the Commissioner, does *clearly reflect income.*

* * * * * * *

(c) *Permissible methods*—(1) *In general.* * * *

* * * * * * *

(iv) *Combinations of the foregoing methods.* (a) In accordance with the following rules, any combination of the foregoing methods of accounting will be permitted in connection with a trade or business if such combination clearly reflects income and is *consistently* used. * * *

* * * * * * *

(2) *Special rules.* * * *

(ii) No method of accounting will be regarded as *clearly reflecting income* unless all items of gross profit and deductions are treated with *consistency* from year to year. The Commissioner may authorize a taxpayer to adopt or change to a method of accounting permitted by this chapter although the method is not specifically described in the regulations in this part if, in the opinion of the Commissioner, *income is clearly* reflected by the use of such method. Further, the Commissioner may authorize a taxpayer to continue the use of a method of accounting *consistently* used by the taxpayer, even though not specifically authorized by the regulations in this part, if, in the opinion of the Commissioner, *income is clearly reflected* by the use of such method. See section 446(a) and paragraph (a) of this section, which require that taxable income shall be computed under the method of accounting on the basis of which the taxpayer *regularly* computes his income in keeping his books * * *.

[Emphasis supplied.]

for the years in which they were received was erroneous. He has made no effort to present evidence as to how and why he determined that an arbitrary number of identical first trust deed notes received in each year were "deferred contracts" to be deducted from gross receipts, while the rest were to be included in the computation of taxable income.

The parties have stipulated a typical example of petitioner's practices in reporting his income from the sale of houses as follows:

TYPICAL EXAMPLE OF POTTER SYSTEM OF REPORTING INCOME FROM SALE OF HOUSES: VALUATION OF IDENTICAL NOTES AT 100 AND 0 PERCENT OF FACE AMOUNT

In 1955 Potter—
  (1) Built 10 similar houses.
  (2) Sold houses for $10,000 each_____ $100,000

      (a) Received $1,500 per house in cash____ $15,000
      (b) Received 10 identical First Trust Deed
            Notes, in face amount of $8,500 each_ 85,000
                                                  ———————
                                                              100,000

  *        *        *        *        *        *        *
  (3) Included in 1955 income all cash received
        from sale of houses_____ 15,000
  (4) Reported the face amount of all 10 First
        T.D. Notes_____ 85,000
  (5) Deducted the face amount of 2 of the 10
        First T.D. Notes (net effect is inclusion of
        only 8 of 10 identical notes in income)[1]_ (17,000)
                                                  ——————— $83,000

  (6) Total included in income_____ 83,000

  (7) Deducted in 1955 the 1955 costs relating to all 10 houses
        ($8,000 each)_____ 80,000

  (8) Profit reported_____ 3,000
  (9) Profit if included in income face amount of all 10 First T.D.
        Notes_____ 20,000

[1] Although costs for 10 houses were deducted in 1955, only 8 First T.D. Notes were included in 1955 income.

As we understand the evidence presented to us, an arbitrary change of the number of first trust deed notes deducted in item (5) of the example, *supra*, would typify petitioner's practice from year to year. Petitioner claims this to have been his "regular" practice throughout the years. If this is so, then we find that petitioner has been regularly inconsistent throughout the years. As was said in *Advertisers Exchange, Inc.*, 25 T.C. 1086 (1956), affirmed per curiam 240 F. 2d 958 (C.A. 2, 1957), at page 1092:

Consistency is the key and is required regardless of the method or system of accounting used. *Beacon Publishing Co.*, 21 T.C. 610, revd. 218 F. 2d 697; *Curtis R. Andrews*, 23 T.C. 1026; *E. W. Schuessler*, 24 T.C. 247; *United States* v. *Mitchell*, 271 U.S. 9; *Cecil* v. *Commissioner*, 100 F. 2d 896.[11]

Petitioner has stipulated his income tax returns were prepared essentially on the cash receipts and disbursements basis and that the profit-and-loss schedule (Schedule C) was filed on a basis similar to a completed-contract method. The ordinary meaning of the cash receipts and disbursements method is set forth in section 1.446–1(c)(1)(i), Income Tax Regs.:

Sec 1.446–1  General rule for methods of accounting.

(c) *Permissible methods*—(1) *In general.* * * *

(i) *Cash receipts and disbursements method.*  Generally, under the cash receipts and disbursements method in the computation of taxable income, all items which constitute gross income (*whether in the form of cash, property, or services*) are to be included for the taxable year in which actually or constructively received. Expenditures are to be deducted for the taxable year in which actually made. * * * [Emphasis supplied.]

If we assume that petitioner filed his income tax returns on this method, then certainly his deduction from gross receipts of the face amount of an arbitrary number of the first trust deed notes received each year was inconsistent with the method and as a result prevented proper reflection of his income from the sale of houses. As we have already set forth, petitioner has stipulated all of such notes had a fair market value and that his practice was erroneous.

Petitioner contends he reported his receipts from the building of houses on a "deferred contract" basis while respondent contends petitioner really reported the receipts on an installment basis. Since we have reserved this question to be considered as issue 2 of this opinion, we merely note at this point that petitioner's practice was consistent with neither method. The rules for the treatment of a sale of real property on the installment method are set forth in section 1.453–5(a), Income Tax Regs.:

Sec. 1.453–5  Sale of real property treated on installment method.

(a) *In general.*  In any transaction described in paragraph (b)(1) of § 1.453–4, that is, sales of real property in which there are no payments during the year of sale or the payments in that year do not exceed 30 percent of the selling price, the vendor may return as income from each such transaction in any taxable year that proportion of the installment payments actually received in that year which the gross profit (as described in paragraph (b) of § 1.453–1) realized or to be realized when the property is paid for bears to the total contract price. In any case, the sale of each lot or parcel of a subdivided tract must be treated as a separate transaction and gain or loss computed accordingly. (See paragraph (a) of § 1.61–6.)

---

[11] Although this language was set forth in a discussion of secs. 41 and 42 of the Internal Revenue Code of 1939 (sec. 41 was the immediate predecessor of sec. 446), it is equally applicable to the accounting provisions contained in the 1954 Code.

An ordinary reading of these rules reveals that a taxpayer who reports income from the sale of real property on the installment method, each year reports as gain that proportion of the installment payments received in the year which the gross profit realized, or to be realized, on the sale bears to the total contract price. Thus, if a house cost $50,000 to build and was sold for $100,000, the gross profit realized (or to be realized) would be $50,000; assuming the sales contract provided for no downpayment in the year of sale and $10,000 payments in each of the succeeding 10 years, and the seller elected to return the receipts of the sale on the installment method, the seller would report as income $5,000 ($50,000/$100,000 × $10,000) in each year as payment was received; the unreported other half of the payments would be a return of basis to the seller. Petitioner's practice of excluding an arbitrary amount of notes from income each year while deducting the costs attributable to such notes in the same year was completely inconsonant with the installment method. Also, petitioner has completely disregarded the requirement set forth in the last sentence of section 1.453-5(a), Income Tax Regs., *supra*, that each sale be treated separately.

The rules for a deferred-payment sale of real property not on the installment method are set forth in section 1.453-6(a) (1) and (2), Income Tax Regs.:

Sec. 1.453-6  Deferred-payment sale of real property not on installment method.

(a) *Value of obligations.* (1) In transactions included in paragraph (b) (2) of § 1.453-4, that is, sales of real property involving deferred payments in which the payments received during the year of sale exceed 30 percent of the selling price, the obligations of the purchaser received by the vendor are to be considered as an amount realized to the extent of their fair market value in ascertaining the profit or loss from the transaction. Such obligations, however, are not considered in determining whether the payments during the year of sale exceed 30 percent of the selling price.

(2) If the obligations received by the vendor have no fair market value, the payments in cash or other property having a fair market value shall be applied against and reduce the basis of the property sold and, if in excess of such basis, shall be taxable to the extent of the excess. Gain or loss is realized when the obligations are disposed of or satisfied, the amount thereof being the difference between the reduced basis as provided in the preceding sentence and the amount realized therefor. Only in rare and extraordinary cases does property have no fair market value.

Though petitioner claims this was the method he employed in reporting receipts from the sale of houses, petitioner's practice only vaguely resembled the deferred-payment treatment which requires the inclusion in income of the fair market value of all notes received. We agree with the conclusion of respondent's expert accounting witness that, whatever the method of accounting used by petitioners, there were

inconsistencies in its application and that the correction of those inconsistencies does not constitute a change of accounting method. We acknowledge that this testimony is not dispositive of the legal issue of whether or not respondent changed petitioner's method of accounting. However, general accounting principles cannot be ignored in determining whether petitioner had a "method" of accounting, what it was, and whether or not it was consistently applied. We find that petitioner used the cash receipts and disbursements method of accounting which he inconsistently applied to his receipts from the sale of houses; that the inconsistent application of such method resulted in an improper reflection of income; and that respondent did not change petitioner's method of accounting for the purposes of section 446 but merely corrected certain errors in his method which were resulting in the exclusion from gross receipts of certain amounts which should have been included therein. Consequently, the provisions of section 481 [12] do not apply to respondent's correction of those errors in petitioner's accounting method.

## *Issue 2*

On December 1, 1955, petitioner and Gladys divided their community property pursuant to a property settlement agreement which was included in a subsequent decree of divorce dated April 16, 1956. Petitioner and Gladys disposed of certain first trust deed notes to each other pursuant to the division of community property. By amended answer filed in docket No. 81795, respondent determined the notes disposed of between petitioner and Gladys were installment obligations within the meaning of section 453(d). Since this issue is raised affirmatively by respondent, he has the burden of proof. Rule 32, Tax Court Rules of Practice; *Kimbell-Diamond Milling Co.*, 10 T.C. 7, 13 (1948); *Hollywood Baseball Association*, 42 T.C. 234, 264 (1964), on appeal (C.A. 9, Aug. 31, 1964).

Respondent contends that although petitioner has labeled the first trust deed notes deducted from gross receipts as "deferred contracts," the notes were, and were treated as, installment obligations within the

---

[12] SEC. 481. ADJUSTMENTS REQUIRED BY CHANGES IN METHOD OF ACCOUNTING.

(a) GENERAL RULE.—In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")—

(1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then

(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except *there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.* [Emphasis supplied.]

meaning of section 44 of the Internal Revenue Code of 1939 [13] and section 453.[14] Respondent further contends the disposition of these notes between petitioner and Gladys was a taxable disposition and that thus the provisions of section 453 (d) apply.[15]

---

[13] SEC. 44. INSTALLMENT BASIS.

(a) DEALERS IN PERSONAL PROPERTY.—Under regulations prescribed by the Commissioner with the approval of the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit realized or to be realized when payment is completed, bears to the total contract price.

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALITY [PERSONALTY].—In the case (1) of a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year), for a price exceeding $1,000, or (2) of a sale or other disposition of real property, if in either case the initial payments do not exceed 30 per centum of the selling price (or, in case the sale or other disposition was in a taxable year beginning prior to January 1, 1934, the percentage of the selling price prescribed in the law applicable to such year), the income may, under regulations prescribed by the Commissioner with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this section. As used in this section the term "initial payments" means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made.

[14] SEC. 453. INSTALLMENT METHOD.

(a) DEALERS IN PERSONAL PROPERTY.—Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—

(1) GENERAL RULE.—Income from—

(A) a sale or other disposition of real property, or

(B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000,

may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).

(2) LIMITATION.—Paragraph (1) shall apply—

(A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after [Aug. 16, 1954] the date of enactment of this title), only if in the taxable year of the sale or other disposition—

(i) there are no payments, or

(ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.

(B) In the case of a sale or other disposition during a taxable year beginning before January 1, 1954, only if the income was (by reason of section 44(b) of the Internal Revenue Code of 1939) returnable on the basis and in the manner prescribed in section 44(a) of such code.

[15] SEC. 453. INSTALLMENT METHOD.

(d) GAIN OR LOSS ON DISPOSITION OF INSTALLMENT OBLIGATIONS.—

(1) GENERAL RULE.—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and—

(A) the amount realized, in the case of satisfaction at other than face value or a sale or exchange, or

(B) the fair market value of the obligation at the time of distribution, transmission, or disposition, in the case of the distribution, transmission, or disposition otherwise than by sale or exchange.

Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received.

(2) BASIS OF OBLIGATION.—The basis of an installment obligation shall be the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full.

Petitioner contends the notes involved were not installment obligations within the meaning of either section 44 of the 1939 Code or section 453; that respondent has the burden of proof as to this issue and has not carried it; and that, if respondent has carried his burden of proof, he has determined the deficiency for the wrong year, i.e., 1955 instead of 1956. In holding for the petitioner on this issue, we find respondent has not carried his burden of proving that the first trust deed notes disposed of between petitioner and Gladys were installment obligations.

As we have set forth above, petitioner's treatment of receipts from the sale of houses was consonant with neither the installment method as set forth in section 1.453–5, Income Tax Regs., nor the deferred-payment treatment not on the installment method set forth in section 1.453–6, Income Tax Regs.[16]

The parties have stipulated that petitioner's treatment of the receipts from the sale of houses was erroneous and petitioner should have included 83 percent of the face value of each first trust deed note in the computation of taxable income for the years in which such notes were received. Respondent has adjusted petitioner's taxable income for the years in question in light of this determination. Thus, respondent has adjusted petitioner's practices to fit squarely within the guidelines set forth in section 1.446–1(c)(1)(i), Income Tax Regs., *supra*, relating to the cash receipts and disbursements method of accounting, which require that all items of gross income be included in the year of actual or constructive receipt.

There is no question that the fair market value of all the first trust deed notes should have been included in gross receipts for the purpose of computing petitioner's taxable income on the cash basis method. Section 61 and the regulations thereunder provide, in part:

SEC. 61. GROSS INCOME DEFINED.

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

\*     \*     \*     \*     \*     \*     \*

(2) *Gross income derived from business;* [Emphasis supplied.]

SEC. 1.61–3  Gross income derived from business.

(a) *In general.* In a manufacturing, merchandising, or mining business, *"gross income" means the total sales, less the cost of goods sold,* plus any income from investments and from incidental or outside operations or sources. \* \* \* The cost of goods sold should be determined in accordance with the method of accounting consistently used by the taxpayer. [Emphasis supplied.]

---

[16] Neither have petitioner's practices been consonant with secs. 39.44–3 and 39.44–4, Regs. 118, which were the immediate predecessors of, and substantially similar to, secs. 1.453–5 and 1.453–6, Income Tax Regs.

Section 1001 and the regulations thereunder provide, in part:

SEC. 1001. DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS.

(a) COMPUTATION OF GAIN OR LOSS.—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

(b) AMOUNT REALIZED.—*The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received.* * * * [Emphasis supplied.]

Sec. 1.1001–1 Computation of gain or loss.

(a) *General rule.* Except as otherwise provided in subtitle A of the Code, the gain or loss realized from the conversion of property into cash, or from the exchange of property for other property differing materially either in kind or in extent, is treated as income or as loss sustained. *The amount realized from a sale or other disposition of property is the sum of any money received plus the fair market value of any property (other than money) received.* The fair market value of property is a question of fact, but only in rare and extraordinary cases will property be considered to have no fair market value. * * * [Emphasis supplied.]

Of course, a cash basis taxpayer may report deferred payments on the installment method. Under section 44 of the Internal Revenue Code of 1939 [17] taxpayers had the option of returning sales income on the installment basis under rules set forth in the Commissioner's regulations under such section. Section 453 [18] gives taxpayers the same option with the further requirement, set forth in section 1.453–1(a), Income Tax Regs., that a taxpayer must make an affirmative election. Petitioner has neither reported his receipts from the sale of houses nor elected to report such receipts on the installment method.

Petitioner, as we have shown above, did not employ the installment method and respondent's adjustments have completely obliterated whatever resemblance petitioner's practices bore to such method. In holding that respondent has not carried his burden of proof as to this issue, we find it unnecessary to determine whether the dispositions of notes between petitioner and Gladys were taxable or whether respondent determined the deficiency for the proper taxable year.

*Issue 3*

The third issue is whether the discount income received by petitioner should be returned as a proportion of each payment received or only after there has been a complete return of principal. This question has arisen because of the parties' stipulation that the first trust deed notes had a fair market value of 83 percent of face value.

---

[17] See fn. 13, *supra.*
[18] See fn. 14, *supra.*

Petitioner contends he is entitled to a complete return of his 83-percent principal before he must report the 17-percent discount income. Respondent contends the first trust deed notes are not speculative and, therefore, petitioner must treat 17 percent of each payment as income.

The parties agree that if the first trust deed notes are held not to be speculative in nature, 17 percent of each payment on the notes will be discount income. *Shafpa Realty Corporation*, 8 B.T.A. 283 (1927). Petitioner, in contending that the notes in question were speculative, cites *Morton Liftin*, 36 T.C. 909 (1961), affd. 317 F. 2d 234 (C.A. 4, 1963), and *Phillips* v. *Frank*, 295 F. 2d 629 (C.A. 9, 1961). Respondent cites the same cases for the proposition that the notes were not speculative.

In *Morton Liftin, supra*, cash basis taxpayers received periodic payments in 1954, 1955, and 1956 on 84 interest-bearing second deed of trust notes which were purchased at discounts of up to 45 percent. The Commissioner determined a proportionate part of each principal payment received on each note, measured by the percentage of discount at which the note was purchased, constituted ordinary income to the taxpayer in the year of payment. Taxpayers claimed they were entitled to a complete return of the amount paid for the contracts before the discount income was to be returned. In holding for the petitioner, the Court said, in part, at page 911:

After a consideration of the cited cases and also of the general statutory provisions (see *May D. Hatch, supra* [14 T.C. 237] at 242–243), we conclude that a rule of law applicable to the instant case may be stated as follows: Where a taxpayer acquires at a discount contractual obligations calling for periodic payments of parts of the face amount of principal due, where the taxpayer's cost of such obligations is definitely ascertainable, and where there is no "doubt whether the contract[s] [will] be completely carried out" (*Hatch* v. *Commissioner, supra* [190 F. 2d 254, reversing in part *May D. Hatch, supra*] at 257), it is proper to allocate such payments, part to be considered as a return of cost and part to be considered as the receipt of discount income; but, conversely, where it is shown that the amount of realizable discount gain is uncertain or that there is "doubt whether the contract [will] be completely carried out," the payments should be considered as a return of cost until the full amount thereof has been recovered, and no allocation should be made as between such cost and discount income.

*In the instant case the petitioner, who of course has the burden of proof, has shown to our satisfaction that the amount of realizable discount income to be derived from the contractual obligations here in question was uncertain. That the notes were highly speculative is evidenced by the substantial discounts (up to 45 percent) at which they were purchased, and the quality of the security which was junior to a first deed of trust (up to 60 to 80 percent of the selling price of the property). The evidence is that makers of the notes had but small equities in the properties covered by the deeds of trust because of their small cash payments to the sellers.* When purchasing notes petitioner gave consideration to the length of time the loan was to run, to the holder's equity in the property, sometimes to his credit standing, and generally to the location and

condition of the property covered by the trust deed after what he called "an outside inspection." *During the few years in question about 19 of the 84 notes were disposed of, about half of them were disposed of by payment in full while the other half were disposed of by foreclosure, the acceptance by the petitioner of a deed, or the acceptance by the petitioner of less than face for an early pay-off. It was petitioner's experience that the latter half of the notes so disposed of resulted in his receiving less than the face value of the notes.* [Emphasis supplied.]

The Court of Appeals, in affirming, said in part, at pages 234–235:

The Tax Court's redetermination was based upon the fully warranted and pivotal factual finding: that, as asserted by the taxpayers, the notes were "highly speculative" and "the amount of realizable discount gain", therefore, remained uncertain until collections on the principal of the notes exceeded their cost to the taxpayers.

In *Phillips* v. *Frank, supra,* cash basis taxpayers received periodic payments in 1955, 1956, and 1957 on real estate contracts or first trust deeds which they had purchased at a discount. The Commissioner determined that a percentage of each payment, in proportion to the total discount, was discount income. Taxpayer claimed he was entitled to a complete return of the amount paid for the contracts before any discount income was to be returned. The District Court found for the Commissioner. The Court of Appeals in reversing the District Court's decision said in part, at pages 633, 634:

The taxpayer recognizes that when periodic payments on each contract equal the purchase price of such contract, payments received by taxpayer in each year subsequent thereto must be treated as ordinary income in the year of receipt. Such is the law. Lee v. Commissioner of Internal Revenue, 7 Cir., 1941, 119 F. 2d 946. The simple question presented on this appeal is: Did the cash basis taxpayer receive during the years under review any payments of which a portion should be allocated to and considered for tax purposes as payment of a portion of the profit which the taxpayer hopes to realize? Taxpayer received for his capital invested the right to receive the unpaid balances due on such contract. What were such rights worth when purchased?

*There is no evidence in the record that such rights had any market value, fair or unfair, or any other value in excess of taxpayer's costs. There is no evidence in the record that taxpayer at any time could have sold such contracts at a profit.* The only source from which he might reasonably expect to realize any part of his profit is from periodic payments subsequent to the return to him of his invested capital. The fact that the likelihood of realizing a profit might increase as the amount of his investment decreases from receipt of periodic payments does not convert any part of such payments into payments on the hoped for or expected profit. Clearly, the payments received by taxpayer during the period under review aggregating less than his costs constitute a return of capital. A return of capital is not income. [Emphasis supplied.]

Both of the above decisions were based on the fact that the obligations in question were highly speculative. In *Morton Liftin, supra,* it was found that the notes were speculative because they were acquired at up to 45-percent discount, were junior securities, payment was un-

certain, and of the notes disposed of, one-half were through foreclosure or receipt of an amount less than face. The contracts in *Phillips* v. *Frank, supra,* were of a similarly speculative nature because it was found that the contracts were difficult to sell, had no fair market value, and losses through default were experienced. Petitioner cites as support for his argument the language on page 634 of *Phillips* v. *Frank, supra,* which reads:

The fact that the likelihood of realizing a profit might increase as the amount of his investment decreases from receipt of periodic payments does not convert any part of such payments into payments on the hoped for or expected profit. * * *

However, petitioner ignores the fact that the immediately preceding language sets forth that the contracts in question had no fair market value and were difficult to sell. Petitioner himself agrees that: (1) All the first trust deed notes he received had a fair market value of 83 percent of face value; (2) no foreclosures ever occurred with respect to any of the 50 notes he received from 1947 through 1956; (3) on occasion the notes, although not seasoned,[19] were valued and accepted at face amount by independent parties (in fact, as we have set forth above, petitioner himself valued those notes which he did not exclude from gross receipts at 100 percent of face value) ; and (4) the value of the property securing all of the notes was always in excess of the unpaid balances on the notes.

Petitioner contends the fact that the interest rate on the first trust deed notes received in 1955 and 1956 was 5 percent, while the prevailing marketplace rate of interest on similar notes in the same years was at least 6 percent, lends weight to his argument that the rates were speculative. It is true that the makers of the notes had only small equities in the houses because they paid only small downpayments and the notes were paid out over periods of as long as 18 years. However, we believe that petitioner's excellent experience with the notes and the apparent facility with which he was able to obtain financing from financial institutions (who accepted the identical first trust deed notes as collateral) countervail these factors. To add further weight to our decision that the notes were not speculative, we have petitioner's counsel's statement, made during his introduction of this issue at trial, that—

It so happened that a good portion of these trust deed notes have been paid off in full, and, therefore, the question more or less becomes moot as far as the petitioner is concerned.

We do not agree that the question is moot although counsel's admission as to the petitioner's excellent experience with the notes does emphasize their nonspeculative nature.

---

[19] Although the parties have not enlightened us as to the meaning of this term, we understand that a seasoned note is one upon which payments have been made over a sufficient period of time to provide the experience necessary to establish a fair market value.

178

We cannot find, as did the courts in *Morton Liftin, supra,* and *Phillips* v. *Frank, supra,* that the notes in question were speculative. The discount income from the notes was 17 percent. In *Darby Investment Corporation* v. *Commissioner,* 315 F. 2d 551 (C.A. 6, 1963), affirming 37 T.C. 839 (1962), not only did the discount involved amount to approximately 26 percent but other relevant factors indicated that the risk of recovery was more substantial than in this case. The court, in ruling for the Commissioner, very appropriately stated at page 552:

The sole issue is whether the petitioner must include as income received with each monthly payment under the contracts, in addition to interest, realized discount income in proportion to the difference between the petitioner's cost and the principal balance due upon the face of such contracts at the date of their purchase. * * *

   *       *       *       *       *       *       *

Determination of the issue turns on the question of whether the investment in the contracts is of such a speculative nature that the purchaser, the petitioner herein, cannot be reasonably certain of ever recovering his cost. Burnet, Commissioner of Internal Revenue v. Logan, 283 U.S. 404 * * *

In our view, petitioner has not established a reasonable uncertainty of ever recovering his cost but rather has stipulated sufficient facts to prove that the first trust deed notes were anything but speculative. Consequently, we hold that petitioner must report 17 percent of each periodic payment on all first trust deed notes received in the years in question as discount income.

*Decisions will be entered under Rule 50.*