JOE M. SMITH AND FLORENCE P. SMITH, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1182–66, 1183–66, 1307–66.   Filed September 21, 1967.

*Myron E. Anderson*, for the petitioners.
*Norman H. McNeil*, for the respondent.

FAY, *Judge:* Respondent determined deficiencies in the Federal income tax of petitioners for the years 1962 and 1963 as follows:

| Year | Docket No. | Petitioner | Amount |
|------|-----------|-----------|--------|
| 1962 | 1182–66 | Joe M. and Florence Smith | $2,438.44 |
| | 1307–66 | Robert H. Anderson, dec'd, Laria M. Anderson, executrix, and Laria M. Anderson | 596.31 |
| 1963 | 1182–66 | Joe M. and Florence Smith | 100,323.57 |
| | 1183–66 | Henry V. and Margaret E. Nielsen | 77,852.86 |

Various adjustments have been stipulated to by the parties, and an unrelated issue in docket No. 1307–66 was abandoned by petitioners at trial. The remaining issues for determination are:

(1) Whether Joe M. Smith, Robert H. Anderson, and Henry V. Nielsen, shareholders in Smith-Nielsen Manufacturing Co., an electing small business corporation, must report as taxable income payments in reduction of indebtedness of the corporation to its shareholders. Their bases for the indebtedness had been reduced, but not to zero, by virtue of adjustments for corporate net operating losses.

(2) Whether Smith-Nielsen Manufacturing Co., having reported as a long-term capital gain the gain on the sale of timberland under a contract which gave the purchaser the right to a discount for full payment before a certain date, may in a subsequent year treat the amount of the discount as an ordinary expense or as a capital loss in the amount of $7,192.80.

---

[1] The proceedings of the following petitioners are consolidated herewith: Henry V. Nielsen and Margaret E. Nielsen, docket No. 1183–66; and Robert H. Anderson, Deceased, Laria M. Anderson, Executrix, and Laria Anderson, docket No. 1307–66.

(3) Whether Joe M. Smith and Henry V. Nielsen, as members of a partnership on an accrual basis, must include a compromise rental payment in the amount of $40,149 actually received on July 31, 1963, in income for the period ended June 30, 1963, or June 30, 1964.

In the interest of clarity separate findings of fact and opinion will be set forth for each issue.

FINDINGS OF FACT

### General

Most of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

Joe M. Smith (hereinafter referred to as Smith) and Florence P. Smith are husband and wife with legal residence in Spokane, Wash., at the time the petition herein was filed. They filed Federal joint income tax returns for the years 1962 and 1963 with the district director of internal revenue at Tacoma, Wash.

Henry V. Nielsen (hereinafter referred to as Nielsen) and Margaret E. Nielsen are husband and wife with legal residence in Spokane, Wash., at the time the petition herein was filed. They filed a Federal joint income tax return for the taxable year 1963 with the district director of internal revenue at Tacoma, Wash.

Laria M. Anderson, for herself and as executrix of the Estate of Robert H. Anderson, deceased, had legal residence in Spokane, Wash., at the time the petition herein was filed. Robert H. Anderson (hereinafter referred to as Anderson) and Laria M. Anderson filed a Federal joint income tax return for the year 1962 with the district director of internal revenue at Tacoma, Wash.

In 1962 Smith, Nielsen, and Anderson (sometimes hereinafter referred to collectively as petitioners), and one Alvin W. Luhr (hereinafter referred to as Luhr) were associated together either as common stockholders or partners in two businesses, namely, Smith-Nielsen Manufacturing Co., a small business corporation (hereinafter sometimes referred to as the corporation), and Smith-Nielsen Logging and Lumber Co., a partnership (hereinafter sometimes referred to as the partnership).

### Issue 1

The corporation, a Washington corporation, was organized November 14, 1948, as Standall, Inc., and was from that date until February 24, 1955, engaged in the manufacture of a saw-sharpening machine. On February 24, 1955, the corporate name was changed to Smith-Nielsen Manufacturing Co. and it acquired and operated a lumber mill at Kettle Falls, Wash. It filed its Federal income tax returns

and kept its books of account on a fiscal year basis ending on October 31. On November 1, 1959, a valid election was made by the corporation under subchapter S of the Internal Revenue Code of 1954 to be treated as a "tax-option" or small business corporation. At that time the stockholders and their respective interests in the corporation were as follows:

| Name | Shares | Percentage of ownership |
|------|--------|------------------------|
| Smith | 17,500 | 35 |
| Nielsen | 17,500 | 35 |
| Anderson | 7,500 | 15 |
| Luhr | 7,500 | 15 |

In addition, as of that date, the capital stock and loans to the corporation by stockholders, recorded on the books as accounts payable due shareholders, were as follows: Capital stock, $12,200; loans from shareholders, $175,900.61. These amounts were owned pro rata by the four stockholders. In addition to the accounts payable due shareholders, as of that date, there was also a sum reflected on the books of the corporation as loans from the shareholders to Standall, Inc., in the amount of $11,959.06. These accounts were carried on the books as open, non-interest-bearing accounts payable.

At the end of its first 2 years of operation as a small business corporation, the fiscal years ending October 31, 1960 and 1961, the corporation suffered operating losses of $62,367.71 and $52,310.07, respectively. The losses were claimed by each of the respective shareholders in the Federal income tax returns for the taxable years 1960 and 1961 in accordance with their respective interests in the corporation. Also during the fiscal year ended October 31, 1961, there was a net payment on the accounts payable from the corporation due the stockholders of $57,193.44.[2]

During the fiscal year ended October 31, 1962, the corporation earned taxable income of $5,067.23, which sum is the total of the taxable income reported per return, plus $806.01 resulting from agreed adjustments to income for that fiscal period proposed by respondent in a prior examination. The four shareholders of the corporation reported their respective shares of income of the corporation for the taxable year 1962; however, said income was not actually distributed to the shareholders. The amount of undistributed income was charged to the shareholders' undistributed taxable income account on the corporation's books of account. Also, during the fiscal year ended October 31, 1962, there was a net payment on the accounts payable due from the corporation to the shareholders of $5,198.46.

---

[2] The term "net payment" means the annual net of debits and credits to the accounts. A net payment, therefore, means that the corporation has paid out, ultimately reaching the hands of the stockholders, more than came into it, as if the corporation had paid the stockholders that amount. The record does not reveal the gross amounts used in computing the net payment.

In June 1963 Anderson's interest in the corporation was acquired by Smith and Nielsen. Luhr purchased the mill operated by the corporation effective January 1, 1963, and as a part of that transaction transferred his interest in the corporation to Smith and Nielsen. As a result of these two transactions, Smith and Nielsen as of the end of fiscal 1963 (Oct. 31, 1963) each owned 25,000 shares or 50 percent of the corporation's stock.

During the fiscal year ended October 31, 1963, the corporation earned taxable income of $51,337.23, which sum is the total of the taxable income reported per return, plus $4,335.45 resulting from agreed adjustments to income for that fiscal period proposed by respondent in this proceeding and as set forth herein. The two remaining shareholders, Smith and Nielsen, reported their share of income of the corporation, $47,001.78, for the taxable year 1963; however, said income was not actually distributed to the shareholders. The amount was charged to the shareholders' undistributed taxable income account on the corporation's books of account. Also during the fiscal year ended October 31, 1963, there was a net payment on the accounts payable due from the corporation to Smith and Nielsen of $67,505.69.

In his statutory notices, respondent determined that the aforementioned payments on the accounts payable due stockholders in the taxable years here involved, after reduction to the stockholders' tax bases in the capital stock and loans payable accounts by reason of the operating losses, resulted partly in recovery of basis and partly in receipt of ordinary income to the shareholders. Respondent states that the measure of the income is that part of the payments which is in proportion to a fraction, the numerator of which is the difference between the principal balance and the basis of the debt and the denominator of which is the principal balance.

## Issue 2

On April 10, 1962, the corporation entered into an agreement to sell to James E. Wyatt (hereinafter sometimes referred to as Wyatt) approximately 3,464 acres of timberland for a price of $51,960. The terms of the contract were $3,000 down, a $9,000 interest-bearing promissory note to be paid January 1, 1963, and 10 equal annual installments totaling $39,960 at 6-percent interest, the first of which was due March 1, 1963. The purchaser had a right to pay the $39,960 balance at any time prior to January 1, 1963, at a discount of 18 percent. The term of the contract pertaining to the right of prepayment provides as follows:

4. That it is understood and agreed between the parties that the Purchasers may have the right to pay the entire unpaid purchase price of $39,960.00 at any time before the 1st day of January, 1963 conditioned upon the Seller then being

the owner of said contract, at a discount of 18% and said Seller further agrees that if said Seller has an opportunity to sell said contract, prior to said January 1, 1963, it shall give the Purchasers notice in writing of said opportunity and said Purchasers shall have ten (10) days in which to purchase said contract at said 18% discount. And, in the event said contract has not been sold by the 1st day of January, 1963, and the Seller elects at a later date to sell said contract, at that time it shall also give said Purchasers at least ten (10) days notice in writing of election to sell said contract and at which the same is to be sold and the Purchasers shall have ten (10) days from and after receiving said notice in which to purchase said contract at the same price the said Seller has elected to sell the same.

For the fiscal year ended October 31, 1962, the corporation reported a long-term capital gain on the sale to Wyatt in the amount of $29,871.83. Thereafter Wyatt timely exercised his right to prepay the contract balance and to take advantage of the 18-percent discount in the amount of $7,192.80.

For the fiscal year ended October 31, 1963, the corporation claimed the $7,192.80 as an ordinary expense. Respondent in his statutory notice of deficiency disallowed the deduction and determined that the amount was properly allowable as a capital loss.

## Issue 3

During the taxable years 1962 and 1963, Smith and Nielsen were partners in a partnership named Smith-Nielsen Logging & Lumber Co. in Spokane, Wash. The partnership had been formed in 1950 and its principal business activity was selling lumber at wholesale. The source of the production of this lumber was either the corporation's mill at Kettle Falls, Wash., or a mill located at Spalding, Idaho, which was owned by the partnership and the Pataha Valley Lumber Co., a Washington corporation. The capital stock of this latter company was owned equally by Smith and Nielsen.

The partnership kept its books of account and filed its Federal information returns (Form 1065) on an accrual method of accounting and on a fiscal year ending June 30. During the taxable year 1962 the partners and their interests therein were as follows:

| Name | Ownership interest percent |
| --- | --- |
| Smith | 35 |
| Nielsen | 35 |
| Anderson | 15 |
| Luhr | 15 |

During the taxable year 1963 Luhr and Anderson withdrew from the partnership with their respective interests therein being acquired by Smith and Nielsen, who thereafter were equal partners. Luhr ceased to be a partner effective January 1, 1963, and Anderson's interest was acquired by Smith and Nielsen on June 29, 1963.

On April 1, 1959, the partnership and Pataha Valley Lumber Co. entered into a lease agreement with Clearwater Lumber Co. (hereinafter referred to as Clearwater), an Idaho corporation, leasing to Clearwater the saw and planing mill located at Spalding, Idaho. The lease provided that the lessors were to receive an annual rent of 50 percent of the net operating profits of the lessee. The rent was to be paid within 60 days following the end of the rental period, which date was the close of the lessee's fiscal period. Clearwater's fiscal period was from June 1 to May 31. The lease also provided that the lessee would have the option to purchase an undivided one-half interest in the leased premises at any time during the term of the lease at a price of $130,000. The lease also provided for the method of payment. In addition the lessee had the right to renew the lease each fiscal period for four consecutive fiscal periods following the termination of the first fiscal period on the same terms and conditions as the original lease.

During the period April 1, 1959, to May 31, 1962, Clearwater had not earned any net profit under the terms of the lease and, hence, the lessors had no rental income from the lease prior to July 1, 1962.

James Johnson, Sr., and James Johnson, Jr. (hereinafter referred to collectively as the Johnsons), were the principals in Clearwater. On April 29, 1963, they came to Smith to discuss the extension of the lease for another year. The lease was due to expire on May 31. Smith, convinced that the lessors had an unprofitable arrangement, refused. The Johnsons demanded that the lease be renewed or, in the alternative, that they be allowed to purchase an undivided one-half interest pursuant to the terms of the existing lease. Again, Smith refused.

Faced with this impasse, the parties discussed, on May 17, 1963, the possibility of a new contract whereby the lessors would sell the plant outright to the lessee or would agree to a new lease with a guaranteed rental. At this meeting no mention was made with reference to current rent.

On May 28, 1963, the parties agreed to a sale of the plant by the lessors to the lessee and orally agreed to payment by the lessee of $45,000 in lieu of the rental for the period ended May 31, 1963, payable by July 31, 1963. This figure was not computed pursuant to the original lease but rather was an agreed sum to cancel the old lease.

Though, for the period June 18 to June 26, the parties negotiated the particulars of the sale of the mill, no further mention was made of the lease cancellation payment. On July 8, 1963, the partnership received a note from the Johnsons for $45,000.[3]

The $45,000 note, $40,149 of which was paid to the partnership,[4]

---

[3] The record contains a cancellation and release agreement between the parties. It is not dated, though in its opening paragraph it states that it is "entered into as of June 1, 1963." Both parties state on brief, however, that the agreement was actually executed on July 8, 1963.

[4] The balance of $4,851 was paid to the Pataha Valley Lumber Co.

was paid on July 31, 1963. The partnership reported its portion of the payment as income for the fiscal year ended June 30, 1964. Respondent in his statutory notice of deficiency determined that the payment accrued and was properly reportable as income in the fiscal year ended June 30, 1963.

OPINION

## Issue 1

The first issue for determination is whether petitioners, shareholders in an electing small business corporation, must report as taxable income any part of certain payments received by them from the corporation in reduction of indebtedness of the corporation to said shareholders. Petitioners' bases for the indebtedness had been reduced, but not to zero, by virtue of adjustments for corporate net operating losses pursuant to section 1376(b)(2) of the Internal Revenue Code of 1954.[5] Petitioners contend that no income is realized from these corporate distributions until such time as petitioners' bases in such indebtedness are exhausted. Respondent, on the other hand, argues that each net payment must be allocated in part to return of basis and in part to income.[6] In essence, therefore, the narrow question presented is the "accounting question"; namely, when will petitioners realize income from these distributions?

The parties have stipulated and we have found as a fact that the loans in question were in fact loans on an open account by the shareholders to the corporation. These loans constituted a valid indebtedness and a debtor-creditor relationship between the corporation and petitioners. The record before us provides no basis upon which to characterize the loans as other than debt. We must therefore reject, as erroneous, petitioners' contentions based upon section 1373 and the regulations pursuant thereto because they apply only to distributions to shareholders in relation to stock and not to payments in reduction of valid indebtedness to creditors even where the creditors are also shareholders. We also reject as erroneous petitioners' contention that no income can result in the absence of a sale, exchange or retirement because, again, such an argument presupposes that these distributions are to shareholders rather than to creditors. Finally, respondent does not place any reliance upon section 1232 and petitioners are in error in suggesting that he does.

The narrow question before us, therefore, is the tax consequence to petitioners where payments are received by them from the corporation in reduction of an indebtedness owed by the corporation to said petitioners.

---

[5] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954.

[6] The "net payment" approach utilized by petitioners has not been questioned by respondent.

The general rule, as stated in *Darby Investment Corporation*, 37 T.C. 839 (1962), affirmed per curiam 315 F. 2d 551 (C.A. 6, 1963), for payments on a debt where the face amount of the debt is in excess of its basis, is that the payments thereon each include income in proportion to a fraction, the numerator of which is the difference between the face amount and the basis of the debt and the denominator of which is the face amount of the debt. The Court in stating the rule relied upon such cases as: *William A. Tombari*, 35 T.C. 250 (1960), affd. 299 F. 2d 889 (C.A. 9, 1962); *Victor B. Gilbert*, 6 T.C. 10 (1946); *Vancoh Realty Co.*, 33 B.T.A. 918 (1936); *Shafpa Realty Corporation*, 8 B.T.A. 283 (1927). The only recognized exception to the general rule of allocating payments, part to be considered as a return of cost and part to be considered as income, is a case in which it can be shown that the amount of gain is uncertain or that there is doubt as to whether the contract will be completely carried out. In such a case the taxpayer is entitled to treat as a return of cost all amounts received until his cost is fully recovered rather than to allocate each payment. See the discussion in *Walter H. Potter*, 44 T.C. 159 (1965); *Morton Liftin*, 36 T.C. 909 (1961), affd. 317 F. 2d 234 (C.A. 4, 1963); *Phillips* v. *Frank*, 295 F. 2d 629 (C.A. 9, 1961). See also *Burnet* v. *Logan*, 283 U.S. 404 (1931).

Petitioners do not contend that they come within the above line of cases and on brief specifically negate the *Burnet* v. *Logan* theory as a possible rationale for their position.

Petitioners do contend that the general rule, stated above, is inapplicable to the case at bar. They point out that the authorities cited dealt with a debt which was evidenced by a note, bond, or contract and which had been acquired at a discount. In the case at bar there was no evidence of indebtedness, and the difference between the basis and the face value of the debt was the result not of a discount purchase but of basis adjustments pursuant to section 1376(b)(2). Though we agree with petitioners that these differences exist, as they affect the application of this rationale to the case at bar, we are of the opinion that they are differences without distinction. It has uniformly been held that the collection of a debt in excess of its basis gives rise to income. *Osenbach* v. *Commissioner*, 198 F. 2d 235 (C.A. 4, 1952), affirming 17 T.C. 797 (1951). We are not convinced that the general rule is necessarily predicated upon the presence of an evidence of indebtedness. Though we have been unable to find in any of the prior cases direct authority for the inclusion of an open account not evidenced by some document within the scope of the general rule, it is our view that such is not the result of any intent to exclude such a situation but rather is the result of its being a somewhat unique factual situation.

We therefore decide this issue in favor of respondent.

*Issue 2*

The second issue is whether the corporation's discounting of a contract in the fiscal year ended October 31, 1963, entitles petitioners Smith and Nielsen to treat such amount as an ordinary expense or a capital loss.

The discount arose pursuant to the terms of a sales contract entered into between the corporation and Wyatt on April 10, 1962. The corporation reported the gain on that transaction as long-term capital gain for the fiscal year ended October 31, 1962. Exercising his contract option to prepay the balance of the purchase price and obtain a discount, Wyatt prepaid the balance during the fiscal year ended October 31, 1963.

Petitioners contend that the discounting of the contract is productive of an ordinary loss due to the absence of any sale or exchange in the fiscal year ended October 31, 1963. We cannot agree.

We are of the opinion that this situation is clearly within the rationale of such cases as *Arrowsmith* v. *Commissioner*, 344 U.S. 6 (1952); *Estate of James M. Shannonhouse*, 21 T.C. 422 (1953); and *Rees Blow Pipe Manufacturing Co.*, 41 T.C. 598 (1964), affirmed per curiam 342 F. 2d 990 (C.A. 9, 1965), so that the character of the loss is fixed by reference to the original transaction, which in this case was capital in nature.[7]

We also note the case of *Wener* v. *Commissioner*, 242 F. 2d 938 (C.A. 9, 1957), affirming 24 T.C. 529 (1955), which though it dealt with a single tax year, held that where a release or compromise is in reality part of the original transaction, it is to be treated as one transaction, i.e., as a reduction in the original purchase price.[8] This case, when viewed in conjunction with the line of authority cited earlier, clearly supports respondent's contention that the discount is productive of a capital loss on the facts before us.

*Issue 3*

The final issue for decision is whether petitioners Smith and Nielsen, as members of a partnership on an accrual basis, must include in income for the period ended June 30, 1963, a compromise rental payment

---

[7] The only authority cited by petitioners on this issue was *Hale* v. *Helvering*, 85 F. 2d 819 (C.A.D.C. 1936), which is clearly distinguishable from the instant case. In *Hale* the debt which was compromised was past due. In the case at bar the discounting was accomplished pursuant to the terms of the original contract and in advance of the date that the installment payments matured.

[8] In the case of *Wener* v. *Commissioner*, 242 F. 2d 938 (C.A. 9, 1957), affirming 24 T.C. 529 (1955), taxpayer-partners sold their interests in a partnership to the remaining partners for cash and an installment obligation. Later that same year, before the various installments became due, the taxpayers agreed to accept a prepayment in cash for the unmatured balance. The court held that such a reduction in amounts not yet due was not merely cancellation of indebtedness but was a reduction in the original purchase price and was treated as a capital loss.

in the amount of $40,149. The crux of this question is whether the compromise rental payment "accrued" to the partnership prior to June 30, 1963.[9]

Under section 451 of the Code the amount of any item of gross income is includable in the taxable year of receipt, unless under the taxpayer's method of accounting such amount is to be properly accounted for as of a different period. In the case at bar the partnership computes its taxable income on an accrual method which prescribes generally that an item be taken in gross income when all the events fixing the taxpayer's right to receive the item in question have occurred and the amount of which is determinable with reasonable accuracy. When all such events have taken place is a question of fact to be determined from a consideration of all relevant factors. See the general discussion of authorities cited in *Commercial Solvents Corporation*, 42 T.C. 455, 469–470 (1964).

In the case at bar the record reveals that on May 28, 1963, the parties orally agreed to the $45,000 payment by the lessee in lieu of the rental for the period ended May 31, payable by the lessee by July 31, 1963. No further mention was made of this agreement even though the parties continued to negotiate the sale of the mill throughout the month of June. The note in the amount of $45,000 was actually received by the partnership on July 8, 1963, and was paid on July 31, 1963.

At a time not specified, the parties entered into a cancellation and release agreement which pursuant to its terms states that it is entered into as of June 1, 1963. On brief the parties both state that the agreement was executed at the same time that the note was given, i.e., July 8, 1963.

Petitioners contend "that there was lacking any degree of certainty that there was any rental due under the terms of the lease." They argue that no amount was agreed upon until the note was issued on July 8, 1963. Such a position is, in our opinion, wholly at odds with petitioners' own testimony at the trial. In reference to the events of May 28, 1963, the record reveals that the $45,000 had been definitely agreed on as of that date and that it did not represent a calculation of the rent under the lease but was a settlement payment in lieu of the rent for the period ended May 31, 1963. It was as Smith stated, "just the round figure, just a basis to get out of it [the lease], we'd take it and forget it." He later added:

It was just like I would say, all right, I will give you forty-five thousand and we'll forget it. No more. We don't have to show you our books, which they never did, whether they made ten thousand or two hundred thousand.

---

[9] Under sec. 706, I.R.C. 1954, in computing the taxable income of a partner for a taxable year, the inclusion with respect to partnership income shall be based on the income of the partnership for any taxable year of the partnership ending within or with the taxable year of the partner.

The record clearly establishes that there was no uncertainty as to the obligation to pay or as to the amount of the payment. Petitioners have not pointed to any contingency or qualification in the partnership's right to receive the payment which existed after the conversation of the 28th and the end of the rental period on May 31, 1963. As we stated in *San Francisco Stevedoring Co.*, 8 T.C. 222, 225 (1947):

A taxpayer, using an accrual method of accounting, must accrue an item in the year in which the taxpayer acquires a fixed and unconditional right to receive the amount, even though actual payment is to be deferred. * * *

See also *Standard Lumber Co.*, 35 T.C. 192 (1960), affd. 299 F. 2d 382 (C.A. 9, 1962).

On the basis of this record, we hold that petitioners have not met their burden of demonstrating that any event which would be required to fix the partnership's right to receive payment or the amount thereof had yet to take place at the end of the partnership's fiscal year on June 30, 1963. We therefore affirm respondent's determination that the item accrued to the partnership in the period ended June 30, 1963.

*Decisions will be entered under Rule 50.*