494 F.2d 465
 74-1 USTC P 9446
 Paul G. CORNELIUS et al., (Mary M. Cornelius as Executrix of
the Estate of Paul G. Cornelius, Deceased,
substituted instead of and in place of
Paul G. Cornelius),
Petitioners-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 No. 73-1005.
 United States Court of Appeals, Fifth Circuit.
 May 16, 1974.
 
 Martin J. Nash, Miami, Fla., Vernon W. Turner, Homestead, Fla., for petitioners-appellants.
 Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Atty., Tax Div. U.S. Dept. of Justice, Lee H. Henkel, Jr., Chief Counsel, Raymond W. Sifly, Atty., I.R.S., Washington, D.C., Henry C. Stockell, Jr., Regional Counsel, Marlene Gross, I.R.S., Miami, Fla., Murray S. Horwitz, Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.
 Before TUTTLE, BELL and GOLDBERG, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 
 1
 Appellant taxpayers, Paul G. Cornelius, Sr. and his wife Mary M. Cornelius, and Jack H. Cornelius (a son of Paul G. Cornelius, Sr.) and his wife Betty J. Cornelius, appeal from a decision of the United States Tax Court declaring that taxpayers were deficient in their income tax payments for taxable year 1967 in the amounts of $59,525.71 and $27,877.72, respectively.[1] This Court has jurisdiction to hear the appeal under Int.Rev.Code of 1954, 7482.
 
 
 2
 From 1960 through July of 1966, Paul Cornelius, Sr., and Jack Cornelius conducted a farming operation as partners under the name Cornelius and Sons. The elder Cornelius had a two-thirds interest in the partnership, and his son had the remaining one-third interest. On July 29, 1966, Paul, Mary, and Jack Cornelius formed a Florida corporation entitled Cornelius and Sons, Inc., which assumed the farming operations of the partnership. The stock records reflect that 9000 shares were issued, with 5999 shares going to Paul Cornelius, one share to Mary Cornelius, and 3000 shares to Jack Cornelius. On August 4, 1966, Cornelius and Sons, Inc. elected to be taxed as a small business corporation under the provisions of Subchapter S of the Internal Revenue Code.[2]
 
 
 3
 Upon forming the corporation, taxpayers transferred to it partnership assets having a basis of $102,000. These assets, which included tractors and implements used in the process of farming, cash, and prepaid land rents, were credited to capital stock and paid-in surplus as follows:
 
 
 4
 Capital Paid-in
 Shareholders Stock Surplus Total
 ------------ -------- ------- -----
Paul Cornelius $5,999 $62,000 $67,999
Mary Cornelius 1 -- 1
Jack Cornelius 3,000 31,000 34,000
 -------- ------- --------
Total--Paul, Mary, Jack $9,000 $93,000 $102,000
 
 
 5
 The vegetable farming operation conducted by the corporation, as by the partnership which preceded it, consisted of growing and harvesting pole beans, yellow squash, and tomatoes, and was of a highly seasonal nature. Substantial funds were required in the fall of each year in order to meet planting expenditures. In the fall of 1966 taxpayers advanced $215,000 to the corporation in the following proportions: Paul Cornelius, $130,000; Mary Cornelius, $20,000; Jack Cornelius, $65,000. These advances, a continuation of the practice initiated by the partnership for financing the fall crop, were borrowed by the shareholders from a bank. Although the advances were reflected on the corporation records as 'notes payable,' no notes were actually given for such advances.
 
 
 6
 In its first short taxable year of operation, which ended December 31, 1966, the corporation incurred a net operating loss of $245,985.97. In accordance with the provisions of section 1374,[3] Paul and Mary Cornelius claimed a deduction of $163,990.65 on their 1966 joint income tax returns, representing their allocable share of the net operating loss of the corporation; correspondingly, Jack Cornelius claimed a deduction of $81,995.32 as his allocable share of the loss. As a consequence of the net operating loss and accompanying deductions, the basis for each of taxpayers' stock accounts was reduced to zero and the basis for each of their debt accounts was partially reduced, pursuant to section 1376(b).[4] The result, as reflected in the following table, was an aggregate reduction in basis for stock of $102,000.00 and an aggregate reduction in basis for indebtedness of $143,985.97:[5]
 
 
 7
 Beginning Sec. 1376 (b) Ending
 Taxpayer Basis Adjustment Basis
-------------- ----------- ------------- ----------
Paul Cornelius
 Stock $ 67,999.00 $ 67,999.00 --
 Debt 130,000.00 95,964.31 $34,035.69
Mary Cornelius
 Stock 1.00 1.00 --
 Debt 20,000.00 26.34 19,973.66
Jack Cornelius
 Stock 34,000.00 34,000.00 --
 Debt 65,000.00 47,995.32 17,004.68
 ----------- ------------- ----------
Total
 Stock $102,000.00 $102,000.00 --
 Debt $215,000.00 $143,985.97 $71,014.03
 
 
 8
 In the spring of 1967, continuing a practice followed by the predecessor partnership, the corporation repaid the $215,000.00 advanced by taxpayers the previous fall. In the fall of 1967, Paul Cornelius and Jack Cornelius advanced $175,000.00-- $116,667.00 and $58,333.00, respectively-- to the corporation to finance the fall crop.
 
 
 9
 Taxpayers treated the spring 1967 repayment and the fall 1967 advance as investment transactions. The Commissioner, however, determined that the $215,000.00 repayment in the spring of 1967 constituted repayment of loans and thus represented gain to the extent that the repayments exceeded the loan bases which had been lowered as a result of the loss pass-through in 1966. According to the Commissioner's ruling, taxpayers would have additional ordinary income of $143,985.97,[6] yielding an additional tax of $89,014.58. The Tax Court sustained the Commissioner's determination.
 
 
 10
 On this appeal taxpayers argue primarily that loans whose bases have been reduced by corporate losses should be treated together with stock as a composite 'investment by a stockholder' for purposes of Subchapter S, so that the bases will be increased when undistributed profits are earned in subsequent years. Alternatively, taxpayers argue that the Tax Court erred in determining that the advances made to the corporation constituted debt rather than equity. Taxpayers make the further alternative argument that the 1967 repayments and readvances should have been netted before any tax incidence was determined. We find taxpayers' contentions provocative and imaginative, but in the final analysis unpersuasive, and we affirm.
 
 
 11
 Subchapter S of the Internal Revenue Code was enacted in 1958 in response to recommendations over a number of years by a variety of individuals and groups-- from entrepreneurs to tax lawyers to the President of the United States-- that small businesses be enabled 'to operate under whatever form of organization is desirable for their particular circumstances, without incurring unnecessary tax penalties.'[7] Most of the reformers suggested that closely held corporations be given the option to be taxed as partnerships. Congress chose instead, however, to create an entirely new statutory superstructure, many of whose potential perquisites and pitfalls have yet to be fully explored. On this appeal our duty is not to map all of the remaining uncharted territory, but to shape the juridical sinuosities of Subchapter S to the narrow problem before us-- the interrelated tax effect of a small business corporation's net operating loss and its repayment of shareholder loans.
 
 
 12
 Although Congress chose not to permit small business corporations to opt for partnership taxation as such, it did through Subchapter S create a system for relieving closely held corporations of federal income tax burdens while passing corporate profits and losses through to shareholders in a manner similar to a partnership.[8] The basis of a shareholder's stock is increased for amounts treated as dividends; and the basis of his stock and of corporate indebtedness are reduced for his portion of the corporation's net operating loss.[9] In the case sub judice the corporation sustained substantial losses in the same taxable year (1966) that taxpayers had made sizeable loans to the corporation. Because of the basis of indebtedness created by the loans, taxpayers were able to offset all of the corporation's net operating losses against ordinary income. Those losses, however, reduced taxpayers' bases in their loans to the corporation; repayment of the loans in the spring of 1967 thus substantially exceeded taxpayers' adjusted bases. Under general tax principles a loan repayment to a taxpayer constitutes income to the extent the repayment exceeds the taxpayer's basis in the loan. Unless the loan is evidenced by 'bonds, debentures, notes, or certificates or other evidences of indebtedness,'[10] such income is taxed at ordinary rates.
 
 
 13
 Taxpayers in the present case argue that the theory of the Subchapter S election is to permit small businesses to elect a form of doing business without regard to the tax consequences of the selection of that form. In accord with that theory taxpayers contend that
 
 
 14
 it is the legislative intent . . . to treat indebtedness and stock as a composite 'investment by a stockholder' and to impose the same tax consequences regardless of the classification of the subsequent distribution to shareholders. (Brief for Appellants at p. 7). Application of that analysis to the facts of this case would result in very limited tax liability upon return to taxpayers of the $215,000.00 in advances. As under the Commissioner's determination, undistributed profits and earnings of the corporation in taxable year 1967 would be passed through to taxpayers and included in their gross income, and the basis of their stock in the corporation would be increased by that amount. According to the analysis proposed by taxpayers, however, the $215,000.00 repayment would be a return of capital and would be taxed only to the extent it exceeded the increased basis in stock. Taxpayers argue that any other result would be illogical and inequitable.
 
 
 15
 Though we could discuss at great length the relative merits and equities of the competing approaches urged upon us by taxpayers and the Commissioner, we must be mindful that, in cases of statutory construction and legislative intent, 'it is our judicial function to apply statutes on the basis of what Congress has written, not what Congress might have written.' United States v. Great Northern Railway Co., 1952, 343 U.S. 562, 575, 72 S.Ct. 985, 993, 96 L.Ed. 1142. In section 1376 of the Code, which governs basis adjustments resulting from Subchapter S distributions, Congress clearly differentiated between 'stock' and 'indebtedness.' Section 1376(a) provides for increases in the basis of 'stock' alone, but section 1376(b) requires basis reductions in both 'stock' and 'indebtedness.' We find nothing in the regulations or in the legislative history to indicate that the plain words of this section yield a distorted view of statutory intent. To the contrary, we can approach 20-20 vision of the statutory meaning through historical hindsight. As early as 1959 the American Bar Association Taxation Committee recommended that section 1376(a) be amended so that undistributed income of a corporation would first increase the basis of the shareholder's indebtedness which had been lowered as a result of net operating losses, and after the basis of indebtedness had been fully restored, would increase the shareholder's basis of stock. 1959 ABA Section of Taxation, Program and Committee Reports 90. The Treasury Department made the same proposal in preparation for the Tax Reform Act of 1969. 2 U.S. Treasury Department, Tax Reform Studies and Proposals 287, 288 (Comm.Print 1969, 91st Cong., 1st Sess., House Committee on Ways and Means and Senate Committee on Finance). The proposal was never enacted. This Court will not grant to taxpayers by judicial interpretation what Congress refused to authorize by legislation at the beseeching of such notable tax cognoscenti.
 
 
 16
 We note that although there has not been a plethora of litigation on this issue, we are not entirely without Circuit precedent to guide our way. In Smith v. Commissioner of Internal Revenue, 9 Cir. 1970, 424 F.2d 219, the Ninth Circuit adopted the opinion of the Tax Court, 1967, 48 T.C. 872, 878-879, on the question of the tax consequences to shareholders in a Subchapter S corporation where, as here, payments were received by them from the corporation in reduction of a valid indebtedness. The Tax Court in Smith reconciled the principles of section 1376 with the general rule concerning repayment of indebtedness:
 
 
 17
 The general rule, as stated in darby Investment Corporation, 37 T.C. 839 (1962), affirmed per curiam 315 F.2d 551 (C.A.6, 1963), for payments on a debt where the face amount of the debt is in excess of its basis, is that the payments thereon each include income in proportion to a fraction, the numerator of which is the difference between the face amount and the basis of the debt and the denominator of which is the face amount of the debt . . ..
 
 
 18
 Petitioners . . . contend that the general rule, stated above, is inapplicable to the case at bar. They point out that the authorities cited dealt with a debt which was evidenced by a note, bond, or contract and which had been acquired at a discount. In the case at bar there was no evidence of indebtedness, and the difference between the basis and the face value of the debt was the result not of a discount purchase but of basis adjustments pursuant to section 1376(b)(2). Though we agree with petitioners that these differences exist, as they affect the application of this rationale to the case at bar, we are of the opinion that they are differences without distinction.
 
 
 19
 48 T.C. 879.
 
 
 20
 In the case sub judice taxpayers concede that, unless this Court rejects the reasoning in Smith, their argument must fail. Our interpretation of the provisions of Subchapter S and of Congressional rejection of attempts to alter it does not conflict with the analysis of the Tax Court as approved by the Ninth Circuit, and we follow its jurisprudential path.
 
 
 21
 Alternatively, taxpayers argue that, even if indebtedness and stock are not entitled to the same tax treatment, the Tax Court erred in determining that the payments in question here constituted debt rather than equity. The thrust of taxpayers' complaint is that the Tax Court relied on the single factor that taxpayers had reported their advances to the corporation as 'loans from shareholders' on their corporate income tax return. They contend that numerous other factors, which should have been considered, support the conclusion that the advances constituted equity rather than debt. We do not agree.
 
 
 22
 This Court has never hesitated to pierce the paper armor of a taxpayer's characterization of a particular transaction in order to reach its true substance. As appellants note, we have done so in situations similar to this one to determine whether shareholder advances to a closely held corporation are to be considered as debts or as contributions to capital. Berkowitz v. United States, 5 Cir. 1969, 411 F.2d 818, 820; Montclair, Inc. v. Commissioner of Internal Revenue, 5 Cir. 1963, 318 F.2d 38, 40. In each such instance, however, we have done so at the request of the Commissioner to prevent a taxpayer from unjustifiably using his own forms and labels as a shield from the incidence of taxation. A taxpayer's attempt to pierce his own armor does not merit the same consideration. In the present case the Tax Court properly held that '(a) taxpayer cannot elect a specific course of action and then when finding himself in an adverse situation extricate himself by applying the age-old theory of substance over form.' 58 T.C. 417, 422, quoting A.W. Legg, 1971, 57 T.C. 164, 169. The Tax Court's holding is in complete accord with the teaching of this Court that 'although a taxpayer's own documents are not conclusive, they normally override any conflicting subjective considerations advanced by that taxpayer.' Redwing Carriers, Inc. v. Tomlinson, 5 Cir. 1968, 399 F.2d 652, 659 n. 9, interpreting Carlton v. United States, 5 Cir. 1967, 385 F.2d 238.
 
 
 23
 This is not to say that a taxpayer may be unfairly and unalterably bound to his own inadvertent error in making a bookkeeping entry. But that is not the situation here. The Tax Court noted that the practice of making temporary loans to the business in the fall with repayment in the spring had been followed for many years. The trial court further observed that the bank was, in fact, the real lender. We are satisfied that the Tax Court correctly determined the payments in question to be debt rather than equity.
 
 
 24
 Taxpayers argue finally that, even if the Commissioner should prevail on the first two issues, the Tax Court committed reversible error because it declined to treat each of the loan transactions as part of an 'open account' by netting advances and readvances and determining the tax consequences as of the end of the taxable year 1967. In their view a tax of some $87,000 has been harshly and unreasonably imposed on a $32,000 net reduction in taxpayers' notes payable account.
 
 
 25
 The real question to be decided is whether each advance to the corporation by the shareholders and its corresponding repayment constitute a separate and complete transaction or whether the indebtedness should be considered as an 'open account' whose fluctuations are to be measured for tax purposes at the end of each taxable year. Taxpayers argue that the latter formulation poses the true economic situation because: 1) the notes payable account has shown substantial balances at the end of every year the business has been in operation and is likely to do so as long as the business continues; and 2) taxpayers have experienced relatively little actual economic change from year to year. These factors, however, are not and should not be determinative. The Tax Court properly determined that 'the 1966 loans and the (1967) repayments thereof constituted a completed transaction, and the loans occurring later in 1967 were separate and apart from such transaction.' 58 T.C. at 423. The fact that these shareholders made loans to their corporation each fall and that the loans were repaid in full each spring, bringing the balance in the notes payable account to zero, strongly supports the Tax Court's finding that the loans were not part of an 'open account.' We concur in that finding.
 
 
 26
 We are not entirely unsympathetic to taxpayers' lament that Subchapter S has been a stern tax master. Taxpayers may have suffered substantially less immediate tax liability had they continued to operate their farming business as a partnership rather than as a Subchapter S corporation. On the other hand, taxpayers fared at least as well under Subchapter S as they would have by conducting their operations in the form of a non-electing corporation. It should be noted that thousands of business enterprises choose corporate status over partnership status for a variety of reasons going beyond the subchapters and subsections of the Internal Revenue Code.
 
 
 27
 Tax sophisticates and commentators have praised the purposes of Subchapter S but have deplored its techniques. Its provisions are said to be
 
 
 28
 complex, imposing an additional stress on a tax system which is already overburdened with miniscule complexity, and disturbing the balanced operation of that system by setting hidden pitfalls for the unwary taxpayer and unjustifiable rewards for the manipulating taxpayer. Instead of accomplishing its purpose of permitting the entrepreneur to select his business form in accordance with business considerations and without regard to the tax consequences of that form, just the opposite result is accentuated by Subchapter S, in providing a third set of tax consequences.
 
 
 29
 7 J. Mertens, Law of Federal Income Taxation 41 B. 44 (1967). These criticisms, however, are properly addressed to the Congress and not to the courts. Ours has been the more mundane assignment of contouring the codified curlicues of Subchapter S to the Code's synoptic minutiae. Being mere mortals unendowed with cosmic tax wisdom, we have performed our task as well as our fallible mentalities and compositions will permit. In so doing we have detected no fatal flaw in the Tax Court's decision.
 
 
 30
 Affirmed.
 
 
 
 [1]
 The Tax Court opinion is reported at 58 T.C. 417 (1972)
 
 
 [2]
 Int.Rev.Code of 1954, 1371-1379
 
 
 [3]
 Int.Rev.Code of 1954, 1374. Corporation net operating loss allowed to shareholders
 (a) General rule.-- A net operating loss of an electing small business corporation for any taxable year shall be allowed as a deduction from gross income of the shareholders of such corporation in the manner and to the extent set forth in this section.
 . . . .l r
 (c) Determination of shareholder's portion.--
 . . . .ina
 (2) Limitation.-- A shareholder's portion of the net operating loss of an electing small business corporation for any taxable year shall not exceed the sum of--
 (A) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of the shareholder's stock in the electing small business corporation, determined as of the close of the taxable years of the corporation . . ., and
 (B) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) or any indebtedness of the corporation to the shareholder, determined as of the close of the taxable year of the corporation . . ..
 
 
 [4]
 Int.Rev.Code of 1954, 1376. Adjustment to basis of stock of, and indebtedness owing, shareholders
 . . . .de
 (b) Reduction in basis of stock and indebtedness for shareholder's portion of corporation net operating loss.--
 (1) Reduction in basis of stock.-- The basis of a shareholder's stock in an electing small business corporation shall be reduced (but not below zero) by an amount equal to the amount of his portion of the corporation's net operating loss for any taxable year attributable to such stock (as determined under section 1374(c)).
 (2) Reduction in basis of indebtedness.-- The basis of any indebtedness of an electing small business corporation to a shareholder of such corporation shall be reduced (but not below zero) by an amount equal to the amount of the shareholder's portion of the corporation's net operating loss for any taxable year (as determined under section 1374(c)), but only to the extent that such amount exceeds the adjusted basis of the stock of such corporation held by the shareholder.
 
 
 [5]
 The share of the net operating loss allocable to each taxpayer exceeded his beginning stock basis; therefore, each was required under 1376(b)(1) to reduce his basis to zero, i.e., an aggregate of $102,000 (the total of the assets transferred to the corporation by the shareholders/taxpayers in 1666). The reduction of $143,995.97 in basis for indebtedness represents the amount by which the net operating loss in 1966 exceeded the adjusted basis of the stock held by the shareholders ($245,985.97-$102,000.00 = $143,985.97)
 
 
 [6]
 This figure represents the proportion of the $215,000.00 1967 repayment of loans denoted by a fraction, the numerator of which is the amount by which the face amount of the debt ($215,000.00) exceeds the basis of the debt after the section 1376(b) adjustment for 1966 operating losses ($71,014.03), and the denominator of which is the face amount of the debt ($215,000.00). ($215,000.00 - 71,014.03/$215,000.00 X $215,000.00 = $143,985.97). See Joe M. Smith, 1976, 48 T.C. 872, 879, aff'd, 9 Cir. 1970, 424 F.2d 219; Darby Investment Corp., 1962, 37 T.C. 839, aff'd, 6 Cir. 1963, 315 F.2d 551
 
 
 [7]
 President Eisenhower's Budget Message to the Eighty-Third Congress, Tax Recommendation #16, January 1953
 
 
 [8]
 Int.Rev.Code of 1954, 1373. Corporation undistributed taxable income taxed to shareholders
 (a) General rule.-- The undistributed taxable income of an electing small business corporation for any taxable year shall be included in the gross income of the shareholders of such corporation in the manner and to the extent set forth in this section.
 (b) Amount included in gross income.-- Each person who is a shareholder of an electing small business corporation on the last day of a taxable year of such corporation shall include in his gross income, for his taxable year in which or with which the taxable year of the corporation ends, the amount he would have received as a dividend, if on such last day there had been distributed pro rata to its shareholders by such corporation an amount equal to the corporation's undistributed taxable income for the corporation's taxable year. For purposes of this chapter, the amount so included shall be treated as an amount distributed as a dividend on the last day of the taxable year of the corporation.
 . . . .for
 For treatment of net operating losses see Int.Rev.Code of 1954, 1374, supra note 3.
 
 
 [9]
 Int.Rev.Code of 1954, 1376. See note 4, supra
 
 
 [10]
 Int.Rev.Code of 1954, 1232