KENNETH D. ALBERT and JEWEL B. ALBERT, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Albert v. Commissioner
Docket No. 5808-77
United States Tax Court
T.C. Memo 1980-567; 1980 Tax Ct. Memo LEXIS 20; 41 T.C.M. (CCH) 591; T.C.M. (RIA) 80567; December 18, 1980
Kenneth D. Albert, pro se. Michael R. Moore, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: The Commissioner determined deficiencies in petitioners' Federal income taxes for the taxable years 1973 and 1974 in the amounts of $ 2,057.08 and $ 490.85, respectively. Respondent having conceded certain adjustments, the following issues remain for our decision: (1) Whether, for purposes of section *23 1374(a)[1] and section 1374(c)(2), petitioners are entitled to increase their basis in their Merrimack Marine, Inc., (hereinafter Merrimack) stock as a result of their personally guaranteeing a portion of a bank loan made to Merrimack, when petitioners were never called upon to repay any portion of this loan as a result of their guaranty. (2) What petitioners' basis in Merrimack is, as of the end of calendar years 1972 and 1973, for purposes of determining the amount of small business corporation losses which could be deducted by petitioners in respect of their ownership interest in Merrimack. (3) Whether a loan of $ 1.074 made by petitioners to Merrimack in 1973 was properly deducted on their 1973 return as a miscellaneous itemized deduction, or whether such loan constituted an indebtedness of the corporation to petitioners which should be treated as an adjustment to their basis in Merrimack for purposes of section 1374(c)(2)(B). (4) Whether petitioners' January 1974 loan of an outboard motor, which cost $ 1,608, and was placed on a boat manufactured *24 by Merrimack and for which petitioners were not reimbursed, gave rise to a business bad debt deductible under section 166(a), or created an indebtedness of the corporation to petitioners under section 1374(c)(2)(B) increasing petitioners' basis in Merrimack; or whether, on the other hand, such unreimbursed loan gave rise to a nonbusiness bad debt under section 166(d). (5) Whether petitioners' sale of their Merrimack stock in June 1973, qualified for installment sales treatment under section 453. (6) Whether petitioners derived a long-term capital gain in the amount of $ 10,710 in 1973 as a result of their sale of Merrimack stock. (7) Whether the loss sustained by petitioners in 1974 as a result of the sale of Merrimack stock in 1973 was properly deducted on their 1974 return as a net operating loss sustained by a small business corporation, or whether it should have been deducted as a long-term capital loss. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits are incorporated herein by this reference. Petitioners Kenneth D. and Jewel B. Albert are husband and wife whose legal residence, at the time *25 they filed their petition in this case, was Yorktown, Virginia. Petitioners timely filed joint Federal income tax returns for taxable years 1973 and 1974 with the Internal Revenue Service Center, Memphis, Tennessee. Merrimack was incorporated on August 5, 1971, in Virginia. Merrimack's operations were based in Newport News, Virginia, until January 1973, when the corporation moved its operation to Greenville, North Carolina. During its entire period of existence, Merrimack was a Subchapter S corporation and was engaged in the business of building small pleasure boats in the 16 to 21-foot class, buying engines for these boats, and marketing the finished product. From August 1972 until June 1, 1973, petitioner Kenneth Albert was vice president and director of Merrimack. He received no compensation in his capacity as a director or an officer of Merrimack. Petitioner Jewel Albert was bookkeeper for the company, and she, too, received no compensation for her work. In August of 1972, 1,430 shares of stock in the corporation were issued to the petitioners for $ 10,000. In January of 1973, 100 more shares were issued to petitioners for $ 710. Also, in January of 1973, all of *26 the stock was recalled because the authorized sale price of the stock was $ 5 per share while the stock had been sold for approximately $ 7 per share. Consequently, petitioners were issued 2,142 shares of Merrimack stock at $ 5 per share to reflect a total investment of $ 10,710. The total number of shares of Merrimack stock which were issued and outstanding as of January 1973 at $ 5 per share, was 9,959. In 1972, petitioners loaned Merrimack $ 7,987 for payrol purposes. This loan was repaid by Merrimack in June 1978. In 1973, petitioners loaned Merrimack $ 1,074 for payroll and miscellaneous expenses. This loan was never repaid, and petitioners claimed the amount of this loan as a miscellaneous itemized deduction on line 33 of Schedule A of their 1973 income tax return. Respondent disallowed this deduction. In January 1974 petitioners purchased an outboard engine at a cost of $1,608 to be used in connection with the display of a Merrimack boat in a boat show. This expense was not reimbursed by Merrimack. Petitioners claimed this expense as a miscellaneous itemized deduction on line 33 of Schedule A of their 1974 income tax return. Respondent disallowed this deduction. *27 On January 15, 1973, Merrimack borrowed $ 100,000 from the North Carolina National Bank. This loan was guaranteed by the Small Business Administration. Petitioners guaranteed $ 35,000 of this $ 100,000 amount, and also pledged three parcels of real property in Florida as collateral. The deeds to these parcels of real property were delivered to a Mr. Hendricks, an officer of the North Carolina National Bank, in May 1973. To effectuate the pledge, petitioners executed a Deed of Trust on April 10, 1973 in favor of the North Carolina National Bank. The hypothecation agreement was canceled on June 29, 1973. Although the Deed of Trust was canceled on August 28, 1973, the title to the property was not returned to petitioners. In May of 1974, the property was sold because the real estate taxes were unpaid. In 1975, petitioners redeemed this property. In 1973, Merrimack executed a "line agreement" (a floor plan financing arrangeent) with a $ 75,000 maximum line of credit with North Carolina National Bank. Petitioners and three other officers of Merrimack guaranteed this loan. Petitioners personally guaranteed $ 18,750 of this loan, one quarter of the $ 75,000 loan amount. *28 While petitioners acted as guarantors for a portion of both the Small Business Administration loan and the $ 75,000 "line agreement" with North Carolina National Bank, they were never called upon as guarantors to satisfy any of the liabilities of Merrimack as a result of those loans. Nevertheless, in computing their basis in their Merrimack stock, petitioners increased their basis by the amount of the $ 18,750 portion of the "line agreement" which they had personally guaranteed. On June 1, 1973, petitioners sold their 2,142 shares of stock in Merrimack to Wayland J. and Marilyn S. Sermons. In consideration for the shares of stock, the Sermons agreed to pay the petitioners the sum of $ 10,710. In addition to this sum, the Sermons agreed to indemnify petitioners in regard to their $ 35,000 guarantee of the Small Business Administration loan. The Sermons further agreed to indemnify petitioners for their $ 18,750 portion of the "line agreement" loan. In respect of the sale of Merrimack stock, the Sermons paid petitioners $ 4,308.64 in November 1973, and an additional payment of $ 5,710 in April 1974 for a total of $ 10,018.64. Petitioners received no further payments in respect *29 of this sale. The $ 10,018.64 amount received by petitioners was $ 691.76 less than the agreed upon $ 10,710 sales price. In 1974, petitioners determined that the $ 691.76 due from the Sermons was uncollectible. Petitioners subsequently claimed this difference as a small business loss, in the amount of $ 710, on line 31 of their 1974 income tax return. Respondent disallowed petitioners' claim of this deduction as a small business loss. During 1972, Merrimack sustained a loss as a result of its business operations. Petitioners deducted their aliquot portion of this loss, and respondent allowed this deduction. However, during 1973, when Merrimack again sustained a loss in its business operations, and petitioners claimed a deduction of $ 8,467 in 1973 as their aliquot portion of this loss, respondent allowed $ 7,231 of this loss and disallowed the balance. ULTIMATE FINDINGS OF FACT As of December 31, 1972, petitioners had an adjusted basis in their Merrimack stock and in the indebtedness of Merrimack to them as shareholders in the aggregate amount of $ 17,987, prior to adjusting their basis for their aliquot portion of Merrimack's 1972 net operation losses. As of June *30 1973, when petitioners sold all of their Merrimack stock, petitioners had an adjusted basis in their Merrimack stock and in the indebtedness of Merrimack to them as shareholders in the aggregate amount of $ 7,231, prior to adjusting their basis for their aliquot portion of Merrimack's net operating loss for the period January 1, 1973, through June 1, 1973. After decreasing petitioners' June 1, 1973, adjusted basis in Merrimack ($ 7,231) by their aliquot portion of Merrimack's net operating losses for the period January 1, 1973, through June 1, 1973, petitioners' adjusted based for their Merrimack stock was zero. In November 1973, petitioners received in excess of 40 percent ($ 4,308.64) of the agreed upon sale price ($ 10,710) in respect of their June 1973 sale of their Merrimack stock to Mr. and Mrs. Sermons. For the taxable year 1974, petitioners were no longer shareholders of Merrimack. In addition, in 1974, petitioners were not engaged in the trade or business of manufacturing, building, or displaying boats, nor were they engaged in the trade or business of lending money or equipment. OPINION All of the issues herein arise from petitioners' ownership of stock in *31 Merrimack. Petitioners were shareholders of Merrimack, a Subchapter S corporation, from August 1972 until June 1973. First, we hasten to point out to petitioners, whom we found to be forthright and credible, that the small business corporation (Subchapter S) provisions, enacted in 1958, are an exception to the general corporate tax structure found in the Code. In Subchapter S, Congress provided special tax provisions (sections 1371-1377) to allow electing corporations to "pass through" to their shareholders the taxable consequences of their activities. Congress wanted to permit businesses "to select the form of business organization desired, without the necessity of taking into account major differences in tax consequences." [S. Rept. No. 1983, 85th Cong., 2d Sess 87 (1958), 1958-3 C.B. 922, 1008.] Taxpayers must conform to each element of the Subchapter S provisions to take advantage of its benefits, and in several instances discussed herein, petitioners have failed to meet the clear and inflexible requirements of the statute. The first issue we will consider is whether petitioners, for purposes of sections 1374(a) and 1374(c)(2), were entitled to increase *32 their basis in Merrimack stock as a result of their personally guaranteeing a portion of a bank loan on behalf of Merrimack they were never called upon to repay. Section 1374[2] gives each shareholders of an electing small business corporation the right to deduct on his or her individual or joint Federal income tax return an amount equal to the shareholders' pro rata share of the corporation's net operating loss. *33 Section 1374(c)(2) limits a shareholder's pro rata share of such loss to the sum of (A) the adjusted basis of the shareholder's stock in the corporation, and (B) the adjusted basis of "any indebtedness of the corporation to the shareholder, determined as of the close of the taxable year." Sec. 1374(c)(2)(B). Thus, put simply, the issue turns on the meaning of "indebtedness of the corporation to the shareholder." In computing their basis in the Merrimack stock for purposes of determining the amount of net operating loss which could be deducted by them as shareholders in 1973, petitioners increased their basis by $ 18,750, the portion of Merrimack's line agreement with the North Carolina National Bank which they had personally guaranteed. Although petitioners stated at trial that they were never called upon directly as guarantors to satisfy any liability of Merrimack as a result of this loan, petitioners contend that the proceeds from the loan were used to maintain Merrimack's daily operations, and portions of the loan were repaid from assets generated in Merrimack's everyday business. During this period, petitioners point out, neither of them received any compensation for their *34 work for Merrimack. However, we do not liken these activities to that of being called upon, under guaranty law, to assume responsibility for the loan on behalf of Merrimack, and thus find no requisite "indebtedness" of Merrimack to petitioners within the meaning of section 1374(c)(2)(B). In addition, petitioners contend that real property which they had put up as collateral for the Small Business Administration (SBA) loan from the North Carolina National Bank was not returned to them but was sold for back taxes. Looking at the record, it is our understanding that petitioners personally guaranteed $ 35,000 of this $ 100,000 loan and pledged real property as collateral. However, the Sermons indemnified petitioners for their guarantee on the loan and it appears to us that their "collateral," while still being held by the North Carolina Bank after the sale of Merrimack stock, was sold for back taxes due to the "bank's negligence" and regained by petitioners sometime in 1975, and was never used to fulfill any obligations on behalf of Merrimack. In light of the above, we find that the clear wording of section 1374(c), the general principles of guaranty law, and the myriad of adjudicated *35 cases interpreting guaranty liability, especially in the context of section 1374, require a decision for respondent. The statutory language plainly refers to a debt of the corporation which runs to the shareholder. There is nothing in the statutory wording, nor the regulations, nor the committee reports which warrants an inference that a shareholder's contract of guaranty with corporate creditors is tantamount to an "indebtedness of the corporation to [the shareholder]." We have held on numerous occasions that unless and until a shareholder who has guaranteed a corporate debt is called upon to pay such guaranty, no debt from the corporation to the shareholder exists for purposes of section 1374(c)(2)(B), and that, in light of this, any outstanding indebtedness of the corporation for which the shareholders are guarantors cannot be taken into account for purposes of computing their pro rata share of the corporation's net operating loss. Perry v. Commissioner, 47 T.C. 159 (1966), *36 aff'd 392 F.2d 458 (8th Cir. 1968); Borg v. Commissioner,50 T.C. 257 (1968); Perry v. Commissioner, 54 T.C. 1293 (1970), aff'd     F.2d     (8th Cir. 1971, 27 AFTR 2d 71-1464 71-2 USTC par. 9502). Furthermore, this is not a case where a Subchapter S corporation was thinly capitalized, or insolvent at the time of the loan. See Blum v. Commissioner,59 T.C. 436 (1972). Nor is there any suggestion from the facts herein that the guaranteed loan was in substance an equity contribution by the taxpayer. See J. A. Maurer, Inc. v. Commissioner,30 T.C. 1273 (1958). In short, there is no suggestion of indebtedness to petitioners by Merrimack for their guaranty of a bank loan to Merrimack, and therefore petitioners' basis in Merrimack stock should not have reflected this guaranteed amount. Petitioners contend that as a result of the loan guaranteed by them, discussed above, and because of their lack of compensation for work done for Merrimack, they had a sufficient basis in Merrimack for 1973 and 1974 to permit them to deduct the full amount of their pro rata share of Merrimack's *37 losses for those years. Respondent contends that petitioners sold their Merrimack stock in June 1973 and thus are unable to deduct any Merrimack losses in 1974 because they were no longer shareholders, (section 1374(a)) and because, as we have decided above, their guaranty of a loan on behalf of Merrimack did not increase their basis. [3]
From the facts herein, it may be recalled that petitioners, in 1972, personally loaned Merrimack $ 7,987 for payroll purposes. This loan was repaid by Merrimack in 1973. In addition, in 1973, petitioners loaned Merrimack $ 1,074 for payroll and miscellaneous expenses. This loan was never repaid. As noted earlier, section 1374(c) provides that a shareholder's portion of the net operating loss of a Subchapter S corporation for any taxable year shall not exceed the sum of the adjusted basis of the shareholder's stock *38 in the corporation, and the adjusted basis of any indebtedness of the corporation to the shareholder, both determined as of the close of the taxable year. In general, section 1376(b), [4] in conjunction with section 1374(c), requires that, for each taxable year, the shareholder's adjusted basis in stock must first be reduced but not below zero, by virtue of the shareholder's aliquot portion of the corporation's net operating losses, before the basis in the corporation's indebtedness to the shareholder is reduced (again, not below zero). *39 Thus, we compute petitioners' basis in Merrimack stock as follows for 1972: [5] Petitioners purchased stock in August 1972, for $ 10,000, and in the same year they loaned Merrimack $ 7,987. Thus, as of the close of the 1972 taxable year petitioners' adjusted basis in Merrimack stock was $ 10,000 and the sum of their adjusted basis in stock and debt of Merrimack was $ 17,987. Petitioners' pro rata share of Merrimack's net operating losses sustained in 1972 was $ 4,553. Petitioners deducted this on their 1972 Federal joint income tax return. Reducing their basis in Merrimackstock by this amount, pursuant to section 1376(b)(1), as of January 1, 1973, leaves us with the following figures: TAXABLE YEAR 1973
Adjusted Basis
Adjusted Basis
STOCK
INDEBTEDNESS
(1) Basis as of
$ 10,000
$ 7,987
12/31/72
(2) Loss claimed on
(4,553)
1972 tax return
(3) Additional stock
710
purchased, Jan.
1973, Cost: $ 710
(4) Loan to corporation
1,074
(5) Loan repaid by
corporation to
petitioners
(7,987)
Total
$ 6,157
$ 1,074
*40 In June of 1973, petitioners sold all of their Merrimack stock to Mr. and Mrs. Sermons. At this time their aggregate basis in Merrimack stock and indebtedness totaled $ 7,231 ($ 6,157 plus $ 1,074). Their pro rata portion of Merrimack's net operating losses from January 1, 1973, until the sale in June 1973, was $ 8,467, and this entire amount they deducted on their 1973 joint income tax return. We agree with respondent that petitioners 1973 deduction was limited to $ 7,231, their adjusted basis in the Merrimack stock and indebtedness as of June 1973, under the terms of section 1376(b). As for the balance, $ 1,608, we find that petitioners may not carry over this amount to 1974, because any losses in excess of the shareholder's adjusted basis for his stock and loans is disallowed as a deduction under section 1374(c) and cannot be carried over to other election years. Plowden v. Commissioner,48 T.C. 666 (1967); 7 Mertens, Law of Federal Income Taxation, sec. 41B.36, p. 87 (1976 rev.). The third and fourth issues herein concern the treatment of two "loans" made by *41 petitioners to Merrimack. The first of these is the previously mentioned loan of $ 1,074 made in 1973 while petitioners were still shareholders. This loan was deducted by petitioners on their 1973 joint income tax return as a miscellaneous itemized deduction, and was treated by them as a section 166(a) business bad debt. However, since this loan was made by petitioners, while they were still shareholders, to Merrimack, it reflects an indebtedness under section 1374(c)(2) of Merrimack to petitioners and must be treated as an increase to their adjusted basis prior to June of 1973. See sections 1374(c)(2)(B) and 1376(b)(2). The other "loan" in question involved an outboard motor which cost petitioners $ 1,608 and which was loaned to Merrimack by petitioners in January 1974, when petitioners were no longer shareholders. The outboard motor was apparently used in connection with the display of a Merrimack boat at a boat show. The expense was not reimbursed by Merrimack, and the motor was apparently not returned. Respondent does not dispute that the debt became worthless in 1974, since the corporation went into bankruptcy that year. Petitioners deducted the $ 1,608 cost of the *42 motor on their 1974 Federal joint income tax return as a section 166(a) business bad debt. However, respondent contends that this loan constituted a section 166(d) nonbusiness bad debt, and we agree. Petitioners were no longer stockholders in Merrimack at the time they loaned the motor, so they cannot make a basis adjustment under section 1374(c)(2)(B). Thus we find that the unreimbursed loan must be considered a nonbusiness bad debt, because, under sections 166(d), [6] petitioners were not in the trade or business of manufacturing boats, loaning outboard motors, or loaning money. Pursuant to section 166(d), for an individual taxpayer the deductions of a bad debt may offset ordinary income only if the debt is a "business" debt, and petitioners have not proven that they were engaged in a trade or business to which the debt of $ 1,608 for the motor is proximately related. Here, Merrimack, not petitioners, was engaged in the trade or business of building and selling small boats, and thus petitioners' purchase and loan of an outboard motor for a Merrimack boat was not proximately related to any trade or business of petitioner and is deductible only under section 166(d) as a short-term *43 capital loss. See Generes v. United States,405 U.S. 93 (1972), and Whipple v. Commissioner,373 U.S. 193 (1963). *44 The fifth and sixth issues concern whether petitioners' sale of their Merrimack stock in June 1973, to Mr. and Mrs. Sermons for an agreed-upon price of $ 10,710 qualified for installment sale treatment under section 453, [7] and the amount of and characterization of the gain from that sale. *45 Petitioners received their first payment in respect of their sale of stock in November 1973, in the amount of $ 4,308.64. They subsequently received an additional payment of $ 5,710 for a total of $ 10,018.64. The balance ($ 691.76) owed to them was never paid. Petitioners indicated at trial that they were under the impression that their sale qualified for installment sale treatment under section 453 because the first payment was less than 30 percent of their basis in the stock. However, section 453 looks not at basis but at the agreed upon sales price. Section 453(a) provides that a person who disposes of personal property on the installment method may report as income therefrom that proportion of the installment payment received in that year which the gross profit from the sale bears to the total contract price. Section 453(b)(2)(B), however, provides that this installment method may not be used if the payments received in the year of sale exceed 30 percent of the selling price. Since the selling price for petitioners' stock was $ 10,710, and petitioners received greater than 30 percent ($ 4,308.64) of the selling price in 1973, the year of the sale, they were not eligible *46 to installment sale treatment under section 453, and thus, all the gain from the sale must be reported on petitioners' 1973 joint income tax return. The next question is the characterization of that gain. From the discussion under the second issue herein, we have found that petitioners' aggregate cost of their stock in Merrimack was $ 10,710 and that the net basis in corporate indebtedness to them over the two-year period involved herein was $ 1,074. As was pointed out previously, petitioners' pro rata portions of Merrimack's 1972 and 1973 net operating losses exceeded petitioners' adjusted basis in Merrimack as of the date of the sale of their stock. As a result, the adjusted basis in their stock as of June 1973, the time of the sale of stock, was zero. Thus, since petitioners held the stock for 10 months (August 1972 to June 1973), we find that they recognized a long-term capital gain on their sale of Merrimack stock in the amount of $ 10,710, for their 1973 taxable year. The seventh and final issue concerns the appropriate treatment of a loss petitioners suffered in 1974 as a result of their receiving $ 691.36 less for their Merrimack stock than the $ 10,710 that had originally *47 been agreed upon. [8] Petitioners reflected this loss on their 1974 joint income tax return as a Subchapter S loss. Respondent contends that since petitioners were no longer shareholders in a Subchapter S corporation in 1974, the loss is not a Subchapter S loss but must instead be considered a long-term capital loss for the taxable year 1974. We agree with respondent. Subchapter S net operating loss deductions are only available to shareholders of small business corporation, section 1374(a), and thus petitioners' loss cannot be reported as an ordinary loss. Rather, this issue is in line with a long line of cases treating the character of a loss by reference to the original transaction, in this case, the sale of Merrimack stock. See Arrowsmith v. Commissioner, 344 U.S. 6 (1952); Smith v. Commissioner, 48 T.C. 872 (1967), aff'd in part and rev'd in part, 424 F.2d 219 (9th Cir. 1970), *48 Wener v. Commissioner,24 T.C. 529 (1955), aff'd 242 F.2d 938 (9th Cir. 1957); Estate of Shannonhouse v. Commissioner,21 T.C. 422 (1953). Accordingly, we find petitioners must take their loss on the sale of Merrimack stock as a long-term capital loss. To reflect the concessions of respondent, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years herein at issue.↩
2. SEC. 1374. CORPORATION NET OPERATING LOSS ALLOWED TO SHARE-HOLDERS. (a) GENERAL RULE.--A net operating loss of an electing small business corporation for any taxable year shall be allowed as a deduction from gross income of the shareholders of such corporation in the manner and to the extent set forth in this section. (b) ALLOWANCE OF DEDUCTION.--Each person who is a share-holder of an electing small business corporation at any time during a taxable year of the corporation in which it has a net operating loss shall be allowed as a deduction from gross income, for his taxable year in which or with which the taxable year of the corporation ends (or for the final taxable year of a shareholder who dies before the end of the corporation's taxable year), an amount equal to his portion of the corporation's net operating loss (as determined under subsection (c)).
(c) DETERMINATION OF SHAREHOLDER'S PORTION.-- (1) IN GENERAL.--For purposes of this section, a shareholder's portion of the net operating loss of an electing small business corporation is his pro rata share of the corporation's net operating loss (computed as provided in section 172(c), except that the deductions provided in part VIII (except section 248) of subchapter B shall not be allowed) for his taxable year in which or with which the taxable year of the corporation ends. For purposes of this paragraph, a shareholder's pro rata share of the corporation's net operating loss is the sum of the portions of the corporation's daily net operating loss attributable on a pro rata basis to the shares held by him on each day of the taxable year. For purposes of the preceding sentence, the corporation's daily net operating loss is the corporation's net operation loss divided by the number of days in the taxable year.
(2) LIMITATION.--A shareholder's portion of the net operating loss of an electing small business corporation for any taxable year shall not exceed the sum of-- (A) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of the shareholder's stock in the electing small business corporation, determined as of the close of the taxable year of the corporation, (or, in respect of stock sold or otherwise disposed of during such taxable year, as of the day before the day of such sale or other disposition), and (B) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of any indebtedness of the corporation to the shareholder, determined as of the close of the taxable year of the corporation (or, if the shareholder is not a shareholder as of the close of such taxable year, as of the close of the last day in such taxable year on which the shareholder was a shareholder in the corporation). (d) APPLICATION WITH OTHER PROVISIONS.-- (1) IN GENERAL.--The deduction allowed by subsection (b) shall, for purposes of this chapter, be considered as a deduction attributable to a trade or business carried on by the shareholder.↩
3. There is no controversy concerning the aggregate amount of Merrimack's net operating losses for 1972 and 1973, nor is there any controversy concerning the portion of Merrimack's losses which were properly allocable to petitioners.↩
4. SEC. 1376. ADJUSTMENT TO BASIS OF STOCK OF, AND INDEBTEDNESS OWING, SHAREHOLDERS. (b) REDUCTION IN BASIS OF STOCK AND INDEBTEDNESS FOR SHAREHOLDER'S PORTION OF CORPORATION NET OPERATING LOSS.-- (1) REDUCTION IN BASIS OF STOCK.--The basis of a shareholder's stock in an electing small business corporation shall be reduced (but not below zero) by an amount equal to the amount of his portion of the corporation's net operating loss for any taxable year attributable to such stock (as determined under section 1374(c)). (2) REDUCTION IN BASIS OF INDEBTEDNESS.--The basis of any indebtedness of an electing small business corporation to a shareholder of such corporation shall be reduced (but not below zero) by an amount equal to the amount of the shareholder's portion of the corporation's net operating loss for any taxable year (as determined under section 1374(c)↩), but only to the extent that such amount exceeds the adjusted basis of the stock of such corporation held by the shareholder.
5. Petitioners contend that respondent's argument is based on petitioners' 1972 taxable year, and that this should not be allowed as the statute of limitations for their 1972 taxable year has run. However, petitioners were not issued a deficiency notice for their 1972 taxable year, and respondent is relying only on basis adjustemtns for that year to determine petitioners' adjusted basis in Merrimack as of January 1, 1973.↩
6. SEC. 166. BAD DEBTS. (a) GENERAL RULE.-- (1) WHOLLY WORTHLESS DEBTS.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) PARTIALLY WORTHLESS DEBTS.--When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. (d) NONBUSINESS DEBTS.-- (1) GENERAL RULE.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt, and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) NONBUSINESS DEBT DEFINED.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
7. SEC. 453. INSTALLMENT METHOD. (a) DEALERS IN PERSONAL PROPERTY.-- (1) IN GENERAL.--Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price. (2) TOTAL CONTRACT PRICE.--For purposes of paragraph (1), the total contract price of all sales of personal property on the installment plan includes the amount of carrying charges or interest which is determined with respect to such sales and is added on the books of account of the seller to the established cash selling price of such property. This paragraph shall not apply with respect to sales of personal property under a revolving credit type plan or with respect to sales or other dispositions of property the income from which is, under subsection (b), returned on the basis and in the manner prescribed in paragraph (1). (b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.-- (1) GENERAL RULE.--Income from-- (A) a sale or other disposition of real property, or (B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $ 1,000, may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a). (2) LIMITATION.--Paragraph (1) shall apply-- (A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition-- (i) there are no payments, or (ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 per cent of the selling price.↩
8. In claiming this deduction, petitioners, for reasons which remain unclear, deducted $ 710 rather than $ 691.36. We find that $ 691.36 is the correct figure representing the difference between the agreed upon sales price and the amount actually received.↩